UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA


WALLACE JAMES BEAULIEU, et al.,                    CIVIL NO. 07-1535 (DWF/JSM)

      Plaintiffs,

v.                                                 REPORT AND RECOMMENDATION

CAL R. LUDEMAN, et al.,

      Defendants.


     The above matter came before the undersigned United States Magistrate Judge upon defendants Joan Fabian and Terry Carlson's Motion for Summary Judgment [Docket No. 174], and defendants Cal R. Ludeman, Jack Erskine, Dean Mooney, Paula Johnson, Denise Considine, Eric Hattenberger, Dennis Benson, Greg Carlson, Brian Ninneman, and Ann Linkert's Motion for Summary Judgment [Docket No. 179].

     This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

## I.    INTRODUCTION

     This case arises out of plaintiffs' action under 42 U.S.C. § 1983.  Plaintiffs have been committed to the Minnesota Sex Offender Program ("MSOP" or "Program") operated by the Department of Human Services ("DHS").  MSOP houses its patients at several facilities, including those located in St. Peter and Moose Lake, Minnesota ("Moose Lake Facility").  Near the Moose Lake Facility is the Minnesota Correctional Facility--Moose Lake ("MCF-ML"), which is owned and operated by the Minnesota Department of Corrections ("DOC").

The actions and conditions at issue pertain to a time period when the DHS was operating the Program on the grounds of MCF-ML in a unit called the "Annex," and also at Complex 1 and the Behavioral Therapy Unit ("BTU") located at the MSOP's Moose Lake Facility.  At the time plaintiffs commenced this suit, plaintiffs were housed in the Annex.  Subsequently, defendants stopped using the Annex to house patients from the MSOP.  <u>See</u> Amended Complaint [Docket No. 146], ¶ 27.  Consequently, plaintiff Wallace Beaulieu ("Beaulieu") was transferred to the BTU; plaintiffs Lionel Yazzie ("Yazzie"), Larry Delaney, Sr. ("Delaney"); Emery Bush ("Bush") and Michael Gimmestad ("Gimmestad") were all transferred to Complex 1; and John Beaulieu III ("Beaulieu III") was transferred to the facility in St. Peter, Minnesota.  <u>Id.</u>

This case challenges various conditions and actions plaintiffs claimed they experienced at the Annex, BTU and Complex 1, and which they alleged were widespread and violated numerous Constitutional rights.  At issue are:

Transfers of Beaulieu and Yazzie to the Annex and search of Beaulieu's room at the Annex in retaliation for the filing of a lawsuit;

Transfer of Beaulieu to the BTU in retaliation for filing the instant suit;

Full body strip searches as patients left and returned to the Annex, or whenever they had contact with visitors;

Use of excessive restraints during transport to and from the facilities;

Seizure of the patients' televisions without compensation;

Unlawful opening of legal mail outside the presence of patients;

Restrictions on telephone usage, including calls involving legal matters;

Double-bunking of inmates;

Use of communal bathrooms and showers;

Unsanitary conditions; and

Restrictions on use of the legal computer.[1]

The Minnesota Department of Human Services ("DHS") defendants (collectively "the DHS Defendants") in this action include the following:

Dennis Benson ("Benson"), the MSOP Executive Director since March 2008;

Denise Considine ("Considine"), the Annex Unit Director from March 2006 until May 2007;

Jack Erskine ("Erskine"), the MSOP Director from the summer 2006 to June 2008;

Greg Carlson ("Carlson"), the MSOP Moose Lake Program Director from May 2008 to the present;

Eric Hattenberger ("Hattenberger"), Annex Unit E Director from March 2007 until April or May 2009;

Paula Johnson ("Johnson"), the security director and program manager for the Annex from the summer of 2006 until November 2007;

Ann Linkert ("Linkert"), the Annex program manager since November 2007 and the program manager of Complex 1 since July 2009;

Cal Ludeman ("Ludeman"), the Commissioner of the Minnesota Department of Human Services;

---

[1]    In their Amended Complaint plaintiffs also challenged daily "wellness checks" at Complex 1; restrictions on their ability to interact or have any contact with DOC prison inmates or guards, and to move around the Annex without an escort; and the routine deprivation of privileges afforded all other civilly-committed detainees, such as daily access to the gym, access to library services, the ability to communicate and socialize with patients within the MSOP, and free access to outside activities. See Amended Complaint, ¶¶ 25, 33. The Amended Complaint also asserted that in the BTU, Beaulieu was denied daily access to the gym, the library, and the ability to communicate with other patients in violation of his procedural due process rights. Id., ¶ 34.   The DHS Defendants moved for summary judgment on these allegations (DHS Defendants' Memorandum in Support of Motion for Summary Judgment ("DHS Mem.") at pp. 48-53), but plaintiffs did not respond.   Plaintiffs' failure to respond to the DHS Defendants' motion on these claims in their opposition results in the claims being waived.  Barnes v. City of Coon Rapids, Minn., Civil No. 07-3672(DSD/JJK), 2009 WL 1178555 at *2 n. 1 (D. Minn. April 30, 2009) (citing Berryhill v. Schriro, 137 F.3d 1073, 1075 n. 2 (8th Cir. 1998) (dismissing unbriefed claim as waived); Graham v. Rosemount, Inc., 40 F. Supp.2d 1093, 1101 (D. Minn. 1999)).

Dean Mooney ("Mooney"), the MSOP Director from February 2004 until summer 2006, and the Moose Lake Site Director (including the Annex) from the summer of 2006 to the summer of 2008; and

Brian Ninneman ("Ninneman"), the BTU group supervisor.

See Affidavit of Corrie A. Oberg in Support of DHS Defendants' Motion for Summary Judgment ("Oberg Aff."), Ex. 10 (Benson Dep.) at pp. 7-8; Ex. 11 (Carlson Dep.) at pp. 10-11; Ex. 12 (Considine Dep.) at pp. 6-7; Ex. 13 (Erskine Dep.) at p. 6; Ex. 14 (Hattenberger Dep.) at pp. 10-12, 23-24; Ex. 15 (Johnson Dep.) at pp. 10-11; Ex. 16 (Linkert Dep.) at pp. 7-9; Ex. 17 (Mooney Dep.) at pp. 5-6; Ex. 18 (Ninneman Dep.) at pp. 7-9; see also Amended Complaint [Docket No. 146], ¶¶ 7, 10-18.

The Minnesota Department of Corrections defendants (collectively "DOC Defendants") are Joan Fabian ("Fabian" or "Commissioner Fabian"), the Commissioner of the DOC, and Terry Carlson ("Terry Carlson" or "Warden Carlson"), the Warden of the Minnesota Correctional Facility at MCF-ML from June 2001 to December 2007. See Amended Complaint, ¶¶ 8-9; First Affidavit of Terry Carlson ("First T. Carlson Aff."), ¶ 1.

In their motion for summary judgment, the DHS Defendants argued: (1) claims for injunctive and declaratory relief as they concern the activities at the Annex are moot; (2) claims against the DHS Defendants in their supervisory capacities cannot proceed; (3) plaintiffs cannot show that they retaliated against Beaulieu and Yazzie for filing lawsuits against DHS employees; and (4) the DHS policies and implementation of those policies related to unclothed full body searches and restraints, disposition of televisions, opening of mail, restrictions on telephone usage and the legal computer, use of communal bathrooms and shared cells, and sanitary conditions are not unconstitutional, entitling them to dismissal of these claims based on qualified immunity.

In their motion for summary judgment, the DOC Defendants maintained that as to those policies and procedures that plaintiffs allege implicated the DOC – the use of full body searches and restraints, disposition of 20-inch television sets, and the opening of legal mail outside the presence of patients – these claims cannot proceed because plaintiffs cannot show that the DOC or DOC Defendants required or were involved in the execution of those policies and procedures.[2]   Additionally, to the extent that plaintiffs have sued the DOC Defendants in their individual capacities, the DOC Defendants contended that plaintiffs' claims fail because they cannot show any personal involvement in the alleged misconduct by Commissioner Fabian and Warden Carlson, and in any event, they are entitled to qualified immunity.   Finally, like the DHS Defendants, the DOC Defendants argued that plaintiffs' request for declaratory and injunctive relief against them regarding violations at the Annex are moot.

In their opposition, plaintiffs asserted there are general disputes of material fact as to all claims in their Amended Complaint, including the DOC Defendants' role in the development and implementation of the DHS policies and procedures at issue in this case, and that their requests for declaratory and injunctive relief are not moot.  In sum, plaintiffs submitted that the policies and actions of all of defendants violated clearly established law and this case should proceed to trial.

## II.   STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is "no genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v.

---

[2]    The DOC Defendants also addressed in their motion plaintiffs' claims regarding exposure to unsanitary conditions.  Plaintiffs did not respond to this argument in their responsive brief.  Therefore, it is waived.  See Barnes, 2009 WL 1178555 at *2 n. 1 (citations omitted).

Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); see also Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219 (8th Cir. 1999).  "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" DePugh v. Smith, 880 F. Supp. 651, 656 (N. D. Iowa 1995) (quoting Anderson, 477 U.S. at 248).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed.  Celotex Corp., 477 U.S. at 322-23; see also Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000).   If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  Anderson, 477 U.S. at 256; Krenik v. County of LeSueur, 47 F.3d 953, 957 (8th Cir. 1995).  "The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial."   Minnesota Laborers Health & Welfare Fund v. Swenke, 2003 U.S. Dist. LEXIS 11439, *4-5 (D. Minn. 2003) (citations omitted).  The non-moving party "must substantiate his allegations with sufficient probative evidence that would permit a finding in [their] favor based on more than mere speculation, conjecture, or fantasy." Wilson v. Int'l Bus. Mach. Corp., 62 F.3d 237, 241 (8th Cir. 1995).

When deciding a motion for summary judgment, a court can only consider admissible evidence. See Henthorn v. Capitol Commc'ns, Inc., 359 F.3d 1021, 1026 (8th Cir. 2004); see also Fed. R. Civ. P. 56(c); Stuart v. Gen'l Motors Corp., 217 F.3d 621, 636 n. 20 (8th Cir. 2000) ("To be considered on summary judgment, documents

must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition. . . .").

## III.   FACTUAL BACKGROUND BEARING ON THE DOC'S ROLE IN THE ANNEX

Due to an increase in the MSOP patient population and while the DHS was expanding its Moose Lake Facility, the DOC agreed to allow the DHS to temporarily take over two units (the Annex) at MCF-ML in 2006, which was near to the MSOP's Moose Lake Facility, referenced by the DOC as the "Annex."  See Oberg Aff., Ex. 10 (Benson Dep.) at pp. 11-12[3]; Affidavit of Scott Benoit ("Benoit Aff.")[4], ¶¶ 7-8; First T. Carlson Aff., ¶ 4.  MCF-ML's exterior perimeter was marked by a razor wire fence. See First T. Carlson Aff., ¶ 10.  The MSOP used Units 8 and 10 of the MCF-ML, which were separated from the rest of the facility by a separate razor wire fence.  Id., ¶¶ 10. The units of the Annex were shaped like a "Y," shared an outdoor courtyard separate from MCF-ML, and were connected together by a corridor under the control of the MSOP.  Id., ¶ 11. The DOC and DHS both had staff that monitored the Annex entrance, but the DOC staff did not interact with patients or visitors of the Annex.  Id., ¶ 10.

Beginning in approximately February 2006, MSOP and DOC staff met to address operational issues related to the temporary use of the facilities by the MSOP.  See Affidavit of Angela Behrens ("Behrens Aff."), Ex. 3 (Mooney Dep.) at pp. 28-38, First T. Carlson Aff., ¶¶ 5, 6.  According to Warden Carlson, it was her duty during the

---

[3]      Both the DHS Defendants and plaintiffs attached to their respective submissions virtually the same deposition transcripts (minus the deposition exhibits attached to the Oberg Affidavit) cited throughout this decision.  Compare Oberg Aff., Exs. 4-18 with O'Neill Aff., Exs. 8-23.  For ease and consistency, this Court has for the most part only cited only to the depositions provided by the DHS Defendants.

[4]      Benoit was the Program Manager for the Annex from September 17, 2008 until July 2009.  Benoit Aff., ¶ 1.  He then became the Program Manager of the Main Building at the Moose Lake Facility, and is responsible for the overall daily operation of the Main Building.  Id.

meetings to communicate to the MSOP the rules in place for MCF-ML and to ensure that the security of the correctional facility was not jeopardized.  See Affidavit of Teresa Nelson ("Nelson Aff."), Ex. 4 (T. Carlson Dep.) at p. 18; Ex. 9 (December 27, 2005 DOC Memorandum).  Warden Carlson shared the DOC's policies regarding security in the hope of ensuring the security of the DOC's facility.  Id. at p. 28.  Warden Carlson also testified that the DOC did not use any other means to ensure that the MSOP used their procedures.  Id. at p. 25.  According to Warden Carlson, at no time did the DOC tell the MSOP that it needed to adopt its policies.  Id.  But, the DOC did ask the MSOP to adopt its policies with regards to security.  Id. at pp. 25-27.

According to DHS witnesses, the MSOP was interested in obtaining from the DOC any advice in upgrading its security practices in light of the recent security breaches it had experienced at the St. Peter facility.  See Behrens Aff., Ex. 3 (Mooney Dep.) at p. 36.  Mooney (a Director for MSOP and the Annex) testified that a DOC official strongly recommended implementing unclothed searches upon leaving and entering the Annex, but that he and Erskine (also a MSOP Director) had already concluded that they were going to implement unclothed searches, given the security risks posed by the patients, the growth of the population and a need to strengthen security.  Id. at p. 36.  In short, Mooney testified that it was the MSOP's decision to implement the use of unclothed searches.  Id.

Erskine, who was Mooney's superior at the time these discussions were taking place, testified that he did not attend the meetings between the MSOP and the DOC regarding the use of the Annex.  Id., Ex. 2 (Erskine Dep.) at pp. 6-7.  However, it was his understanding, based on what Mooney told him, that the only policy that MSOP had to adopt with regards to the use of the Annex was the policy implementing unclothed

searches of patients.  <u>Id.</u> at pp. 8-10.  Erskine testified that the decision to implement the unclothed searches based on the DOC's request was not done lightly, and was reviewed by the DHS and therapy staff, given there was a concern that the unclothed searches would disrupt the therapeutic environment.  <u>Id.</u> at pp. 9-10.  Erskine stated that the unclothed full body searches were adopted because the MSOP needed the space temporarily and because it was reported to him by his staff that if they did not adopt the search policy, the DOC would not allow the MSOP to use the Annex.  <u>Id.</u> at p. 12.  However, other than the unclothed full body search policy, the MSOP developed its own security policies, and no other DOC policies were implemented at the Annex, although in some cases, the DOC policies served as a reference.  <u>Id.</u> at p. 14.

In July of 2009, the MSOP moved out of the Annex and the DOC converted the Annex into living units for its inmates.  <u>See</u> First Carlson Aff., ¶ 4; Second Affidavit of Terry Carlson ("Second T. Carlson Aff."), ¶ 2.

With this background, the Court will proceed with analyzing the facts, arguments of the parties and the law bearing on each of the claims at issue in this case.

## IV.    ANALYSIS

### A.    <u>Injunctive Relief Pertaining to the Annex</u>

The DHS and DOC Defendants both argued that plaintiffs cannot maintain their requests for injunctive and declaratory relief since they are no longer housed at the Annex.  <u>See</u> Memorandum of Law in Support of Defendants Fabian and Carlson's Motion for Summary Judgment ("DOC Mem.") at pp. 18-19; DHS Mem. at p. 31. Plaintiffs countered that defendants have offered no guarantee that MSOP patients will never again be housed at the Annex and that the voluntary cessation of the alleged illegal practice does not divest this Court of its ability to determine the legality of the

practices.   See Plaintiff' Memorandum in Opposition to DHS Defendants' Motion for Summary Judgment ("Pls.' DHS Opp.") at p. 26.

Claims for injunctive and declaratory relief arising out of being held in a state institution are rendered moot when the affected individuals are transferred out of these institutions, and there is no evidence that they might be returned.   Roubideaux v. North Dakota Dept. of Corrections and Rehabilitation, 570 F.3d 966, 976 (8th Cir. 2009); see also Pratt v. Corr. Corp. of Am., 267 Fed. Appx. 482, 2008 WL 612571 at *1 (8th Cir. 2008) (table decision) (concluding inmate's § 1983 claims for declaratory and injunctive relief were moot when he was transferred to another facility and was no longer subject to alleged unlawful conditions); Smith v. Hundley, 190 F.3d 852, 855 (8th Cir. 1999) (same).

Since commencement of this suit, plaintiffs have been transferred from the Annex, the MSOP no longer keeps patients at the Annex and the Annex is now being used to house DOC inmates.   Thus, plaintiffs are no longer subject to the policies and conditions pertaining to the Annex and there is no suggestion that any MSOP patients, let alone plaintiffs, will be housed at the Annex.   Therefore, plaintiffs' § 1983 claims for injunctive and declaratory relief are moot as it relates to the Annex and should be dismissed.

### B.   Retaliation Claims

Plaintiffs alleged in their Amended Complaint that in violation of the First and Fourteenth Amendment, DHS Defendants Ludeman, Mooney, Erskine, and other staff at the MSOP retaliated against plaintiffs Beaulieu and Yazzie for filing a § 1983 suit on December 7, 2006 by engaging in the following retaliatory conduct: transferring them to the Annex; reducing their access to religious services, attorneys, the court and visitation

rights; subjecting Yazzie to unreasonable restraints during his transfer to the Annex; and subjecting Beaulieu's room to unreasonable searches, resulting in the unlawful seizure of legal papers and the unlawful opening of legal mail outside of his presence. See Amended Complaint, ¶ 19.  In addition, Beaulieu alleged that after learning he had filed the Complaint in the instant suit by unlawfully opening and reading his mail, the DHS Defendants retaliated by transferring him to the BTU in Moose Lake, which is akin to a segregation unit in a prison facility.  Id., ¶ 28.

With regards to the transfer of Beaulieu and Yazzie to the Annex, the DHS defendants asserted their claim of retaliatory transfer fails because they were notified of their transfer over a month before filing their lawsuit, they were not participating in treatment and could only reenter treatment through classes solely offered at the Annex. As for Beaulieu's transfer to the BTU, the DHS Defendants contended that the undisputed evidence shows that he was transferred by his clinical team based on his behavior while at the Annex, and not in retaliation for filing the instant suit.

Beaulieu and Yazzie disagreed with the DHS Defendants' characterization of the facts, arguing that the close temporal relationship between the filing of their suits and their transfers to more restrictive facilities, as well as the seizure of legal documents and computer access restrictions following Beaulieu's transfer to the BTU, are sufficient to create a genuine dispute of material facts on their claim that their transfers were in retaliation for the lawful exercise of their First Amendment rights.  See Pls.' DHS Opp. at p. 32.

"'A prima facie case of retaliatory discipline requires a showing that: (1) the prisoner exercised a constitutionally protected right; (2) prison officials disciplined the prisoner; and (3) exercising the right was the motivation for the discipline.'"  Haynes v.

Stephenson, 588 F.3d 1152, 1155 (8th Cir. 2009) (quoting Meuir v. Greene County Jail Employees, 487 F.3d 1115, 1119 (8th Cir. 2007)).   The filing of an inmate lawsuit is protected First Amendment activity.   Haynes v. Stephenson, 588 F.3d 1152, 1155-56 (8th Cir. 2009) (citation omitted).

In order to sustain a retaliation claim, a plaintiff must show that the primary purpose of the defendant's alleged retaliatory action was to punish the individual for attempting to exercise his constitutional rights. As explained by the Court of Appeals, "[t]o succeed on a claim of retaliatory transfer or retaliatory discipline, an inmate must prove that, but for an unconstitutional retaliatory motive, the transfer or discipline would not have occurred." Johnson v. Esry, No. 98-2573, 210 F.3d 379, 2000 WL 375269 at *1 (8th Cir. April 13, 2000) (citation omitted) (emphasis added); see also Senty-Haugen v. Goodno, 462 F.3d 876, 890 (8th Cir. 2006) ("To prevail on his retaliation claim that he was transferred because of the exercise of his first amendment rights, Senty-Haugen must show that 'but for' his objections to Patient X's transfer and his grievances he would not have been transferred to Moose Lake and that 'a desire to retaliate was the actual motivating factor behind the transfer.'") (quoting Goff v. Burton, 91 F.3d 1188, 1191 (8th Cir. 1996)).

Thus, a prisoner must show that he would not have suffered the alleged retaliatory mistreatment at issue "but for" the defendant's retaliatory motive.   Kind v. Frank, 329 F.3d 979, 981 (8th Cir. 2003) (prisoner's retaliation claim was properly dismissed where he "failed to show that but for his assertions of his constitutional rights, he would not have been transferred"); see also Eaton v. Dooley, No. 992784, 230 F.3d 1362, 2000 WL 1121369 *1 (8th Cir. Aug. 09, 2000) (prisoner's "claim that he was transferred and his property was confiscated in retaliation for filing his own lawsuits"

was unsustainable because he "did not show that the transfer would not have occurred but for the lawsuits"); Hazen v. Reagen, 16 F.3d 921, 926 (8th Cir. 1994) ("for an inmate to prove that his transfer was in retaliation for the exercise of First Amendment rights, he must establish that he would not have been transferred 'but for' the retaliatory reason").  "Even at summary judgment, 'the burden is on the prisoner to prove that but for an unconstitutional, retaliatory motive the transfer would have not occurred." Webb v. Hedrick, No. 09-2896, 2010 WL 4366438 at *1 (8th Cir. Nov. 5, 2010) (quoting Sisneros v. Nix, 95 F.3d 749, 752 (8th Cir. 1996), quoting Goff, 7 F.3d at 738).

### 1.    Beaulieu and Yazzie's Transfer to the Annex

The MSOP began using the Annex to house patients in August 2006.  The patients that the MSOP transferred to the Annex were sent there because they were not participating in conventional sex offender treatment.  See Oberg Aff., Ex. 12 (Considine Dep.) at pp. 8-9; Ex. 14 (Hattenberger Dep.) at pp. 19, 20-21; Ex. 17 (Mooney Dep.) at pp. 25-26.  As of October 2, 2006, Beaulieu had been cited for not being present for treatment meetings, and on October 5, 2006, he withdrew from treatment.  Affidavit of Stacey Sonnek ("Sonnek Aff."), Exs. S-1 (October 2, 2006 Treatment Notice); S-2 (Consent for Participation in Sex Offender Program date October 5, 2006).[5]   On November 1, 2006, Beaulieu was first given notice by St. Peter staff that he would be transferred to the Annex, as he was not participating in the structured treatment program at St. Peter and staff determined that the Annex was an appropriate treatment unit for him.  Id., ¶ 5.  On same day, Beaulieu signed a new consent for treatment form. Id, ¶ 5, Ex. 3.  It was noted in Beaulieu's November 15, 2006 Individual Treatment Plan that he "has an extended history of either being removed from prior treatment

---

[5]     Sonnek is the Clinical Supervisor of MSOP, and served as the MSOP Social Services Director and from October 2006 to March 2009.  Sonnek Aff., ¶ 1.

placements or not completing the program due to a lack of motivation, failure to make progress, not completing assignments, being dishonest, and aggressive behaviors. Id., ¶ 3.

Beaulieu acknowledged that he withdrew from treatment on October 5, 2006, due to unwillingness by St. Peter to make an accommodation for him to practice his religion. See Affidavit of Brian B. O'Neill in Support of Plaintiff' Memorandum in Opposition to DHS Defendants' Motion for Summary Judgment (O'Neill Aff.), Ex. 1 (Declaration of Wallace James Beaulieu ("Beaulieu Decl.")), ¶ 4. Beaulieu also testified at his deposition that prior to his transfer to the Annex, he had withdrawn from treatment at St. Peter, but that he had signed the paperwork in November 2006 so he could return to treatment. See Oberg Aff., Ex. 5 (Beaulieu Dep.) at pp. 10-12; Sonnek Aff., Ex. S-3 (MSOP Consent for Participation on Sex Offender Treatment dated November 1, 2006); Beaulieu Decl., ¶ 8 (stating he signed the "Consent to Treatment" on November 11, 2006).

The next trimester that Beaulieu could participate in treatment started in mid-January of 2007. See Sonnek Aff., ¶ 7. This is because when a patient stops treatment, they are required to participate in a Treatment Refresher Group, which is designed to assist patients with addressing the issues that led them to stop treatment, before they are allowed to rejoin a treatment group. Id., ¶ 8. Beaulieu testified that he was not told about having to participate in a Treatment Refresher Group until December 6, 2006, which he believed was after the Religious Suit was served on the defendants. See Oberg Aff., Ex. 5 (Beaulieu Dep.) at pp. 14-15. As of January 2007, St. Peter no longer offered the Treatment Refresher Group, Id., ¶ 10. Therefore, patients who wanted to re-enter treatment could no longer do so at St. Peter. Id.

14

Beaulieu stated at his deposition that while he was told he was not on the list at the Annex to participate in treatment, he never submitted a request regarding participation in treatment readiness.  See Oberg Aff., Ex. 5 (Beaulieu Dep.) at pp. 16-17.

Yazzie testified at his deposition that he was not participating in treatment at the point in time he was transferred from St. Peter to the Annex.  Id., Ex. 9 (Yazzie Dep.) at p. 10.  It was his understanding that everyone was being transferred because of space issues and because of non-treatment.  Id. at pp. 11-12.

On December 7, 2006, Beaulieu and Yazzie filed a civil action under 42 U.S.C. § 1983, File No. 06-cv-4807 (JMR/JSM), claiming denial of their religious freedom in violation of the First Amendment ("Religion Suit") [File No. 06-cv-4807, Docket No. 1].

On December 26, 2006, both Beaulieu and Yazzie were given the "original" 7-day notices of transfer to the Annex.  Beaulieu Decl., ¶ 11.  Beaulieu stated he was told by Social Worker Jerry Ranslow and the Behavior Analyst on the North Unit to disregard that notice, as they had a verbal agreement with the Site Director Nancy Johnston that he would be returning to the Pexton Unit to continue treatment.  Id., ¶ 12.

On December 27, 2006, the summons was issued by the Clerk of Court for the Religion Suit.  See File No. 06-cv-4807, Docket No. 12.

On December 29, 2006, Beaulieu and Yazzie received "new" 7-day notices of transfer to the Annex.  Id..¶ 14.  Beaulieu was transferred to the Annex on January 2, 2007.  See Oberg Aff., Ex. 5 (Beaulieu Dep.) at p. 8.  Yazzie was transferred to the Annex on January 11, 2007.  Id., Ex. 9 (Yazzie Dep.) at p. 64.

According to Beaulieu, the conditions at the Annex were more restrictive than at St. Peter.  See Oberg Aff., Ex. 5 (Beaulieu Dep.) at p. 96.  However, both Beaulieu and Yazzie testified that they were subjected to the same rules and policies as other

patients housed at the Annex.  Id., Ex. 5 (Beaulieu Dep.) at pp. 19-20; Ex. 9 (Yazzie Dep.) at pp. 14-15.  Yazzie stated that although he had a decreased access in the Annex to religious services, to attorneys, to the courts and to visitation by family, all of the patients had the same level of access.  See Oberg Aff., Ex. 9 (Yazzie Dep.) at p. 14.  Similarly, Beaulieu testified that all patients' access to social activities, recreational activities, the ability to visit with an attorney, to call the court or have visitors, were essentially the same.  Id., Ex. 5 (Beaulieu Dep.) at pp. 20-22.

On January 3, 2007, Beaulieu testified that his room at the Annex was searched by Beth Verdan and Thane Murphy of the Office of Special Investigation ("OSI") while he was not present.  Id. at pp. 25-26.  Murphy told Beaulieu that legal papers had been taken, copied and returned to his room.  Id. at p. 26.  Beaulieu defined "legal papers" as anything he used for legal reasons, including request forms that have information bearing on this case, research he has conducted, and MSOP policies and procedures he has accumulated that relate to any case he is working on.  Id. at pp. 26-27.  Beaulieu did not know if any papers that he had written in a lawsuit or in preparation of a lawsuit had been copied because Murphy would not tell him what had been copied.  Id. at pp. 27-28.  Beaulieu stated that he had no proof that the MSOP staff had taken or copied any legal papers from his room and that no one told him that his room was searched and papers were copied because of the Religion Suit he had filed.  Id. at p. 28.

On January 17, 2007, a Summons was served in the Religion Suit on Ludeman, Mooney, Erskine, Nancy Johnston, Gary Grimm, and Tim Brown.  See File No. 06-cv-4807 (JMR/JSM) [Docket No. 12].

Based on this record, this Court concludes that Beaulieu and Yazzie cannot make out a claim of retaliatory transfer based on the filing of the Religion Suit because they have not shown that the filing of the suit was the "but for" cause for their transfers. Beaulieu first received notice of his pending transfer in November 1, 2006, and both Beaulieu and Yazzie received their 7-day notices of transfer to the Annex on December 27, and again on 29, 2006.  See Beaulieu Decl., ¶ 14; Sonnek Aff., ¶ 5.  Yet the Summons for the Religion Suit was not issued by this Court until December 27, 2006, and the Summons and Complaint for the suit was not served on defendants until January 17, 2007.  See File No. 06-cv-4807 [Docket Nos. 1, 12].  The DHS Defendants could not have retaliated against Yazzie and Beaulieu for commencement of the Religion Suit because the undisputed record shows they did not have notice of the lawsuit when the decision to transfer was made or implemented.[6]

Further, even if the DHS Defendants had notice of the Religion Lawsuit, Beaulieu and Yazzie have not met their burden to show that the transfers would not have occurred "but for" the filing of the Religion Suit.  They, like other patients that the MSOP transferred to the Annex, were transferred because they were not participating in conventional sex offender treatment.  See Oberg Aff., Ex. 17 (Mooney Dep.) at pp. 25-26; Ex. 12 (Considine Dep.) at pp. 8-9; (Hattenberger Dep.) at pp. 19-20.  Beaulieu was given notice by St. Peter staff notice that he was being transferred to the Annex because he was not participating in the structured treatment program at St. Peter and staff determined that the Annex was an appropriate treatment unit for him.  See Sonnek

---

[6]     Even if plaintiffs could had shown (which they did not) that defendants had notice of the Religion Suit because in the search of Beaulieu's room on January 3, 2007, they read or copied papers related to this suit, at least as to Beaulieu, this fact is irrelevant to Beaulieu's retaliation claim.  This alleged incident occurred <u>at the Annex</u>; that is, <u>after</u> his transfer had already taken place.

Aff., ¶ 5.  Beaulieu acknowledged that he withdrew from treatment on October 5, 2006 and asked to be removed from the treatment unit at St. Peter.  See O'Neill Aff., Ex. 1 (Beaulieu Decl.), ¶ 4.  While Beaulieu testified that prior to his transfer to the Annex, he had signed the paperwork so he could return to treatment, the only available class for re-entry into treatment was at the Annex.[7]  See Oberg Aff., Ex. 5 (Beaulieu Dep.) at pp. 10-12; see also Sonnek Aff., ¶¶ 7, 8, 10.

Similarly, Yazzie testified that he was not participating in treatment at the point in time he was transferred from St. Peter to the Annex.  Id., Ex. 9 (Yazzie Dep.) at p. 10.  It was his understanding that everyone was being transferred because of space issues. Id. at pp. 11-12.

The undisputed record supports a finding that Yazzie and Beaulieu were transferred to the Annex based on their initial refusal to participate in treatment and space issues, as opposed to an improper motive.  The fact that the protected activity and transfer are temporally close, without more, is insufficient evidence of retaliatory motive to survive summary judgment.  See Wickner v. McComb, Civ. No. 09-1220 (DWF/JJK), 2010 WL 3385079 at *16 (D. Minn. July 27, 2010) (citing Dasta v. Shearin, No. 04-4475 (MJD/RLE), 2007 WL 4952768 at *23 (D. Minn. Nov. 15, 2007)).

---

[7]  This Court notes that Beaulieu stated in his Declaration that Social Worker Jerry Ranslow told him that an agreement had been worked out with Site Director Nancy Johnston, so that he could return to treatment at St. Peter, but that after the defendants received notice of suit he was informed by Jerry Ranslow that Nancy Johnston had changed her mind.  See O'Neill Aff., Ex. 1 (Beaulieu Decl.), ¶¶ 12-16.  However, this Court cannot consider this double-hearsay as part of the record on summary judgment. See Henthorn, 359 F.3d at 1026.  But even if this testimony was admissible, the undisputed facts remain that no defendant had notice of the Religion Suit before the decision to transfer or the actual transfer occurred.

### 2.      Search of Room, Seizure of Papers and Restrictions on Access to Facilities

A room search at the MSOP can occur randomly or if investigators have a reason to search a room.  <u>See</u> Oberg Aff., Ex. 12 (Considine Dep.) at p. 11.  With regards to the search of his room and seizure of his papers, Beaulieu admitted that nothing had been taken from his room and that he was unable to tell which of his documents had been copied by staff members.  <u>See</u> Oberg Aff., Ex. 5 (Beaulieu Dep.) at pp. 25-28.  In any event, the undisputed facts are that no defendant had notice of the Religion Suit before the search was performed on January 3, 2007.  Further, the MSOP was certainly within its bounds to conduct a warrantless search of Beaulieu's room as a means to provide a safe and secure environment, (<u>Semler v. Ludeman</u>, Civil No. 09-0732 ADM/SRN, 2010 WL 145275 at *21-22 (D. Minn. Jan. 08, 2010) (citing <u>Bell v. Wolfish</u>, 441 U.S. 520 , 556-57 (1979)), and Beaulieu did not show that the search and seizure would not have occurred "but for" the commencement of the Religion Suit.

Similarly, any complaint that the transfer to the Annex and accompanying reduction in access to facilities was a form of retaliation is without merit, where again no evidence was submitted to establish that a the DHS Defendants had notice of the Religion Suit prior to transfer, and where both Beaulieu and Yazzie testified that they were subjected to the same rules and access as other patients at the Annex.  <u>See</u> Oberg Aff., Ex. 5 (Beaulieu Dep.) at pp. 19-22; Ex. 9 (Yazzie Dep.) at pp. 14-15.

### 3.      Transfer of Beaulieu to the BTU

Patients are typically placed in the BTU due to disruptive behaviors, antisocial behaviors, aggressive behaviors, treatment concerns, criminal activity, not complying with the rules or interfering with other patients' treatment.  <u>See</u> Oberg Aff., Ex. 12 (Considine Dep.) at p. 15; Ex. 13 (Erskine Dep.) at p. 31; Ex. 14 (Hattenberger Dep.) at

p. 54; Ex. 15 (Johnson Dep.) at pp. 70-71; Ex. 17 (Mooney Dep.) at p. 27; Ex. 18 (Ninneman Dep.) at p. 12.  A patient's treatment team, as opposed to the defendants in this case, decides whether a patient's behavior warrant placement in the BTU.  Id., Ex. 17 (Mooney Dep.) at pp. 26-28, Ex. 18 (Ninneman Dep.) at p. 12.

On January 21, 2007, Beaulieu requested to be transferred to the BTU, which was denied by Considine on the basis he did not qualify for BTU placement.  Id., Ex. 12 (Considine Dep.), Dep. Ex. 2.

In February 2007, Beaulieu had nine instances of abusive language and behavior, verbal or physically threatening behavior, unit disruption and noncompliance with the rules involving his interactions with other patients and staff members.  See Affidavit of Barbra Berg Windels ("Windels Aff.") [Docket No. 185], Ex. W-2 (Affidavit of Ralph Schmidt),[8] ¶ 7.  This included yelling at a patient to "shut the fuck up" and threatening to "slap the shit out of" the patient.  Id.  Other instances included a January 8, 2007 incident where Beaulieu threatened that if he was forced to sleep in the top bunk, staff better be ready to place him in the BTU; a January 20, 2007 incident where Beaulieu made comments that when he got out, he was going to go watch the game in someone's house regardless of whether he was invited, the president should be shot, he was going to shoot any new candidates for president, and he was going to stare back at staff and "nit pick" them if that was what they were going to do to him; another incident on January 20, 2007, where Beaulieu made a comment that he wanted to know the name of the staff person at the staff station earlier in the day and that "if staff were going to put a target on me, I will put a target on them"; a February 24, 2007 incident where Beaulieu stated that he would not be cooperative with staff and his

_____

[8]     Ralph Schmidt is the DHS's Director for the office of special investigations.

supervisor and that the police would have to be brought in to deal with him; and an incident (undated) where Beaulieu walked into the Annex computer room and made threats stating "all you mother fuckers better watch your step, each and everyone of you. You don't know me." Oberg Aff., Ex. 2 (Supplemental Incident Reports).

Beaulieu was transferred to the BTU on March 3, 2007. See Oberg Aff., Ex. 5 (Beaulieu Dep.) at p. 8. The initial Complaint in this case was filed with the Court on March 14, 2007 [Docket No. 1].

Beaulieu represented that he initially mailed the Complaint in this matter on February 28, 2007, but that it was returned to him because he needed to file separate affidavits from each named plaintiff in order to proceed in forma pauperis. According to Beaulieu, the return envelope from the Court had been opened and staples had been removed from the documents. See O'Neill Aff., Ex. 1 (Beaulieu Decl.), ¶ 26; Ex. 44 (Beaulieu Aff.) at p. 3. The Summons was not issued until June 7, 2007.

Based on this record, the Court concludes that Beaulieu's transfer from the Annex to the BTU was not "but for" the filing of the instant action. An inmate may be placed in the BTU by his treatment team due to aggressive and disruptive behaviors. See Oberg Aff., Ex. 12 (Considine Dep.) at p. 15; Ex. 13 (Erskine Dep.) at p. 31; Ex. 14 (Hattenberger Dep.) at p. 54; Ex. 15 (Johnson Dep.) at pp. 70-71; Ex. 17 (Mooney Dep.) at p. 27; Ex. 18 (Ninneman Dep.) at p. 12. Between January 2, 2007, the date of his transfer to the Annex, and March 3, 2007, the date Beaulieu was transferred to the BTU, he had numerous instances of aggressive and disruptive behaviors. See Windels Aff., Ex. W-2 (Affidavit of Ralph Schmidt), ¶ 7; Oberg Aff., Ex. 2 (Supplemental Incident Reports). Thus, despite the filing of the present lawsuit, the undisputed evidence shows

that his treatment team had perfectly good grounds for transferring Beaulieu to the BTU due to his behavior at the Annex.

For all the reasons stated above, the DHS defendants' motion for summary judgment as it relates to plaintiffs' retaliation claims should be granted and the claims be dismissed with prejudice.

## C.     Use of Unclothed Full Body Searches

Plaintiffs claimed that the MSOP, "guided by" DHS Defendant Ludeman (the Commissioner of the DHS), and DOC Commissioner Fabian and Warden Carlson violated plaintiffs' Fourth Amendment right against unreasonable searches and seizures by forcing them to submit to invasive full-body strip searches before and after transport from the Annex and after contact visits, and by requiring plaintiffs to be handcuffed and shackled during transport from the Annex or other Moose Lake facilities.  See Amended Complaint, ¶ 20.   Plaintiffs also asserted that any refusal to submit to such searches and restraints resulted in punishment, including protective isolation, decreased privileges and decreased access.   Id.   In addition, plaintiffs alleged that the DHS Defendants, in violation of the Fourth Amendment, have required patients in both the BTU and Complex 1 to be subjected to full-body strip searches after transport from the Moose Lake Facility, even though patients are accompanied by staff who can assure that patients do not have access to contraband.  Id., ¶ 29.   According to plaintiffs, if a patient refuses the search, they are placed into protective isolation and their clothes are forcibly removed.  Id.

The MSOP conducted unclothed visual body searches of Annex patients before and after they left the Annex's secured perimeter, after contact visits, or based on reasonable suspicion.   See Oberg Aff., Ex. 11 (Carlson Dep.) at pp. 24-25, 32-33;

Ex. 12 (Considine Dep.) at p. 29; Ex. 14 (Hattenberger Dep.) at p. 15; Ex. 16 (Linkert Dep.) at pp. 11-12; Ex. 17 (Mooney Dep.) at pp. 43-44.   This search policy was conducted uniformly across the patient population, as opposed to singling out patients with specific risks, as previous behavior is just one indicator of future behavior.  <u>See</u> O'Berg Aff., Ex. 10 (Benson Dep.) at p. 79.  The MSOP policy does not require a less intrusive search prior to a strip search.  <u>Id.</u> at p. 44.  Based on the MSOP's experience with persons in secured facilities, unclothed searches of patients were an effective method of detecting hidden weapons, escape paraphernalia, handcuff keys obtained while in the secured perimeter and other contraband.  <u>See</u> Oberg Aff., Ex. 10 (Benson Dep.) at pp. 24-25, 32-37; Ex. 11 (Carlson Dep.) at pp. 26, 36; Ex. 12 (Considine Dep.) at p. 46.  A hand patdown over clothing was not as effective as unclothed searches because small items could be missed and there are various places that cannot be searched as part of a pat down.  <u>Id.</u>, Ex. 14 (Hattenberger Dep.) at p. 18; Ex. 17 (Mooney Dep.) at p. 44.

The search procedure consisted of two staff members and a patient in a private room where the patient takes off his clothing and gives it to one staff member to be searched, while the other staff member conducts a visual search of the patient's naked body from five feet way, including having the patient lift their genitals, show their arm pits and the bottoms of their feet, spread their fingers, spread their buttocks, open their mouths, and run their hands through their hair.  <u>See</u> Oberg Aff., Ex. 17 (Mooney Dep.) at pp. 42-43; Ex. 4 (Beaulieu III Dep.) at pp. 9-10; Ex. 5 (Beaulieu Dep.) at pp. 40-41; Ex. 6 (Bush Dep.) at pp. 13-14; Ex. 7 (Gimmestad Dep.) at pp. 11-13; Ex. 8 (Delaney Dep.) at pp. 9-10; Benoit Aff., ¶ 28.  The inmate is then allowed to dress.  <u>See</u> Benoit

Aff., ¶ 28.  A patient is only touched by staff if it appears he is about to lose his balance to keep the patient from falling.  <u>See</u> Oberg Aff., Ex. 17 (Mooney Dep.) at p. 63-64.

If a patient refused to subject himself to a strip search before a contact visit, they were only allowed to have a non-contact visit.  Oberg Aff., Ex. 12 (Considine Dep.) at p. 30.  If a patient refused to subject himself to a strip search before transport, the patient was not allowed to go on the transport, except in cases of medical emergencies. <u>Id.</u>, Ex. 11 (Carlson Dep.) at pp. 27; Ex. 12 (Considine Dep.) at p. 30; Ex. 17 (Mooney Dep.) at pp. 44-45.  If a patient refused to be searched on return to the facility, they were placed in protective isolation for one-to-one observation until they complied with the search.  <u>Id.</u>, Ex. 14 (Hattenberger Dep.) at p. 26; Ex. 15 (Johnson Dep.) at p. 22; Ex. 17 (Mooney Dep.) at pp. 45, 64.

Beaulieu III, testified that he underwent an unclothed full body strip search while at the Annex in the manner described above.  <u>See</u> O'Berg Aff., Ex. 4 (Beaulieu III Dep.) at pp. 8-9.  Beaulieu III, could not recall if he was ever touched during the searches.  <u>Id.</u> at p. 9.  The searches lasted for 5 minutes.  <u>Id.</u>

Beaulieu testified that he underwent an unclothed search when he first entered the Annex in January of 2007 and again when he left the Annex in March of 2007.  <u>Id.</u>, Ex. 5 (Beaulieu Dep.) at p. 38.  These searches lasted approximately 10 minutes and he was not touched during the searches.  <u>Id.</u> at pp. 38-40.

Bush testified that he was forced to submit to an unclothed search three to four times a week, as part of his attending a sweat lodge ceremony outside of the perimeter of the Annex.  O'Berg Aff., Ex. 6 (Bush Dep.) at p. 11.  Bush stated that he was not touched during the searches.  <u>Id.</u> at p. 12.

DeLaney asserted that he was required to undergo unclothed searches every time he left the facility, including when he had to go to doctor and dentist appointments. O'Berg Aff., Ex. 8 (DeLaney Dep.) at pp. 9-10.  DeLaney asserted that a female staff person assisted in the unclothed search of him on December 2, 2008 and that he witnessed a female staff member monitoring a camera feed from a search of Beaulieu in November of 2008.  Id. at pp. 10-12.

Gimmestad testified that he underwent visual unclothed searches when he first entered the Annex in October of 2006, when he had to go over to the main building and back to the Annex in April of 2007, in November of 2008 when he went to a dentist visit, and when he left Moose Lake to be transferred to St. Peter.  O'Berg Aff., Ex. 7 (Gimmestad Dep.) at pp. 8-12.

Yazzie testified that he was subjected to unclothed searches at least every other week when he attended the sweat lodge for religious services.  O'Berg Aff., Ex. 9 (Yazzie Dep.) at p. 31

Since July of 2009, the MSOP's policy has been to require unclothed searches before and after transport, after contact visits upon suspicion and after approval by the facility director, or if there was reasonable suspicion to believe a patient had committed a crime or if were in the possession of contraband.  See O'Berg Aff., Ex. 10 (Benson Dep.) at pp. 29-31; Ex. 16 (Linkert Dep.) at pp. 12-13.  When a patient refuses to submit to an unclothed search, staff-assisted unclothed searches will only occur upon prior permission from the Executive Director or a designee and cannot take place unless "there is reasonable suspicion of imminent substantial risk to the safety or health of a patient of the security of the facility."  Id., Ex. 10 (Benson Dep.) Dep. Ex. 3 (MSOP Procedure 301.010-5ALL), ¶ F1.  Alternatively, a patient who refuses to submit to an

unclothed search can be placed in protective isolation, a patdown will be conducted, and the patient is then put in an empty room with constant surveillance. Id., Ex. 4. If a patient continues to refuse, an unclothed search may occur, upon reasonable suspicion as set forth above, with permission of the Executive Director or designee. Id. In developing this policy, the MSOP's clinical staff was consulted and they did not identify any specific clients for whom the unclothed searches would counter their therapeutic progress, so as to warrant an exclusion from the search policy. Id. at p. 45.

Patients at Complex 1 are not required to undergo unclothed searches when they travel to participate in the sweat lodges or anywhere else inside of the secured perimeter. See Oberg Aff., Ex. 16 (Linkert Dep.) at p. 19.

The articulated purpose of the unclothed searches was to protect transport teams and the public when patients leave the MSOP's facilities and to protect staff and patients from the dangers posed by contraband that could be smuggled into MSOP facilities. See Oberg Aff., Ex. 15 (Johnson Dep.) at p. 23. The MSOP has had a history of patients secreting upon themselves contraband that could be used in assisting in an escape during a transport, such as a wire, a fashioned key that could be used to open cuffs, and glass. Id. at pp. 23-24. The MSOP had high profile escapes occurring in 2005 and 2006. Id., Ex. 10 (Benson Dep.) at pp. 9-10, 13. Another escape took place in 1995. Id., Ex. 11 (Carlson Dep.) at p. 36. There has also been a history of escape attempts, shootings, murders and hijackings, when patients have hijacked a transport because a patient had handcuff keys or a soup bar shaped as a gun. Id., Ex. 10 (Benson Dep.) at pp. 24-25; Ex. 13 (Erskine Dep.) at p. 20. Escape paraphernalia, including hacksaws, have been smuggled into the MSOP facilities. Id., Ex. 10 (Benson Dep.) at pp. 24-25; Ex. 11 (Carlson Dep.) at p. 36.

Further, drugs have been found in the MSOP facilities. Id., Ex. 10 (Benson Dep.) at p. 25; Ex. 15 (Johnson Dep.) at p. 24. Even one of the plaintiffs, Beaulieu, was convicted, and spent time in jail for his participation in an attempt to smuggle cocaine and marijuana into the MSOP facilities. Id., Ex. 5 (Beaulieu Dep.) at p. 66.

The DHS Defendants argued that summary judgment is appropriate on plaintiffs' unclothed search claims because searches conducted after contact visits, before transport and after transport were reasonably related to protecting the safety of patients, staff and the public. See DHS Mem. at pp. 37-41. The DOC Defendants asserted that they had nothing to do with the search policies at issue. See DOC Mem. at pp. 11-12.

Plaintiffs countered that the MSOP's search policy was not reasonable because the MSOP's security concerns cannot justify the blanket search policy, less intrusive methods exist to detect contraband, the MSOP had not provided an explanation as to why searches were need to be conducted before a patient leaves a secured perimeter, the searches deter patients from seeking medical care and attending religious activities, and the search policy compromises the dignity of patients. See Pls.' DHS Opp. at pp. 38-42. As for the DOC Defendants' argument, plaintiffs submitted that it was MSOP's belief that they had follow DOC policies on security based on the statements of Warden Carlson, including the unclothed search policy, if the MSOP wanted to use the Annex. See Plaintiffs' Memorandum in Opposition to DOC Defendants' Motion for Summary Judgment ("Pls.' DOC Opp.") at p. 16.

Under the Fourth Amendment, "[t]he right of the people to be secure in their persons against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. Amend. IV; see also Bell, 441 U.S. at 558 ("'The Fourth Amendment prohibits

only unreasonable searches', . . .") (quoting Carroll v. United States, 267 U.S. 132, 147 (1925)).

Citing to Serna v. Goodno, 567 F.3d 944, 949 (8th Cir. 2009) and Bell, both the DHS defendants and plaintiffs agree that the Eighth Circuit has concluded that a civilly committed person's status, for the purpose of determining his constitutional rights under the Fourth Amendment against unreasonable searches, is the same as that afforded to pretrial detainees. See DHS Mem. at p. 37; Pls.' DHS Opp. at 37.

The United States Supreme Court in Bell examined the propriety of visual body cavity searches of pretrial detainees and prisoners. In that case, all detainees were required to expose their body cavities for a visual inspection as part of a strip search conducted after every contact visit with a person from outside of the facility. Id. at 558.[9] The detainees were not to be touched at any time during the visual search procedure. Id. The district court upheld the strip-search procedure on summary judgment, but prohibited the body cavity searches absent probable cause to believe that the individual inmate was concealing contraband. Id. at 558. The appellate court affirmed the decision of the district court.

The Supreme Court reversed, finding that in determining whether a search is reasonable for Fourth Amendment purposes, the need of the search is balanced against the invasion of personal rights that the search entails, and this balancing requires a court to examine the scope of the search, the manner it was conducted, the justification for the search, and the place it was conducted. Id. at 559 (string citation omitted). The Supreme Court recognized that "a detention facility is a unique place fraught with

---

[9]     The search policy at issue in Bell required a male inmate to lift his genitals and bend over to spread his buttocks for visual inspection and for female inmates, the vaginal and anal cavities were visually inspected. Id. at 558, n. 39.

serious security dangers.  Smuggling of money drugs, weapons, and other contraband is an all too common an occurrence."  Id.  The Court also noted that concealing of contraband on an inmate's bodies also occurs.  Id. (citations omitted).  In balancing the "significant and legitimate security interests" of a detention facility with the "privacy interests of the inmates," the Court concluded that visual body cavity searches can be conducted on less than probable cause.  Id. at 560.

The Eighth Circuit has recognized that "[a]lthough an involuntary committed person at a state hospital is not a prisoner per se, his confinement is subject to the same safety and security concerns as that of a prisoner."  Revels v. Vincenz, 382 F.3d 870, 874 (8th Cir. 2004) (citing Andrews, 253 F. 3d at 1061) (holding that an excessive-force claim from any involuntarily committed state hospital patient should be evaluated under the same standard as an excessive-force claim brought by a pretrial detainee). As such, this Court finds the decisions in Goff v. Nix, 803 F.2d 358 (8th Cir. 1986), cert. denied, 484 U.S. 835 (1987) and Franklin v. Lockhart, 883 F.2d 654 (8th Cir. 1989), cases involving visual body searches of prisoners, instructive.  In Goff, the Eighth Circuit addressed a district court's issuance of a permanent injunction following a trial enjoining the visual body cavity and searches at issue on grounds that the searches violated the Fourth Amendment.  See Goff, 803 F.2d at 360.  Using the Bell balancing test, the Eighth Circuit upheld the constitutionality of visual body cavity searches performed on state inmates in a state prison.

The prison officials in Goff had implemented a policy of visual body cavity searches of all inmates "when an inmate enters or leaves the institution or the cell house if the inmate is in one of the segregation units, before and after contact visits or after exposure to general population inmates if the inmate is in a segregation unit, and

any other time when there is a reasonable suspicion that an inmate is concealing contraband in a body cavity." Goff, 803 F.2d at 360.  In applying the Bell balancing test, the Eighth Circuit recognized the discretion given prison administrators and found that the security concerns of administrators outweighed the intrusion of the inmates' personal rights resulting from the visual body cavity searches.  See Goff, 803 F.2d at 366.  The Eighth Circuit also recognized and expressed agreement with two lines of cases addressing the validity of visual body cavity searches: (1) those cases finding that visual body cavity searches of those charged with traffic offenses or misdemeanors are unreasonable, unless "reasonable suspicion" exists; and (2) those cases involving visual body cavity searches of persons who already have been convicted and who are incarcerated in facilities or who are pretrial detainees charged with felonies, which did not warrant the same level of constitutional protections under the Fourth Amendment. Id. at 370 (citations omitted).

Similar to the searches conducted in this case, in Franklin, the plaintiffs challenged a prison policy that required visual body cavity searches of inmates in segregation for punitive purposes, inmates housed in administrative segregation, and those inmates requiring protective custody.  883 F.2d at 655.  The reasons espoused by prison officials for the visual body cavity searches were that these inmates were the most dangerous of all inmates and that contraband, including a homemade knife and a shotgun shell, had been discovered.  Id.  Following an evidentiary hearing, the district court struck down the body searches on grounds that they violated the Fourth Amendment.  Id. at 654.  The Eighth Circuit, reversed and upheld the body searches under the Bell balancing test, stating:

> [W]e hold that the searches as conducted at the Cummins Unit violate neither the eighth nor the fourth amendment when viewed in the light of <u>Wolfish</u> and <u>Goff</u> . . . Our holding is, of course, limited to the facts established in this case and should not be read to constitute a carte blanche approval of all VBC searches. Where there is no substantial evidence that the manner of the search is an 'exaggerated . . . response to the perceived security concerns,' however, we must give wide-ranging deference to prison officials on matters concerning institutional security.

<u>Id.</u> at 657 (quoting <u>Goff</u>, 803 F.2d at 362-63).

More recently, the Eighth Circuit in <u>Serna</u>, in upholding the district court's decision on summary judgment, addressed a challenge of a facility-wide visual body cavity search of all MSOP patients after a cell phone case was found in a facility common area. 567 F.3d at 947. The MSOP considered cell phones to be a threat to security and treatment. <u>Id.</u> In examining <u>Bell</u>, the Eighth Circuit noted that the Supreme Court had rejected the assertion of the pretrial detainees' that visual body-cavity searches conducted upon detainees' re-entry to a detention facility following their contact visits with outside persons was unreasonable based on the fact that the security interest of keeping contraband out of the detention center outweighed the privacy interests of the detainees. <u>Id.</u> at 949-50 (citing <u>Bell</u>, 441 U.S. at 558-59). In conducting the balancing test dictated by <u>Bell</u>, the Eighth Circuit noted that cell phones were a threat to institutional security. <u>Id.</u> at 953. In addition, the Eighth Circuit determined that the Moose Lake staff had heightened concerns about the presence of a cell phone given the discovery of the case and the history of cell phones being used by inmates in the program. <u>Id.</u> The Eighth Circuit concluded that "history of contraband in the building" was a sufficient justification for visual body-cavity searches, as opposed to mere "perceived security concerns." <u>Id.</u> (citations and marks omitted). Further, the appellate court noted that failure by the MSOP to conduct patdowns was relevant to the

reasonableness of the search, however, the Eighth Circuit refused to adopt a requirement that an institution must attempt less intrusive methods of searches before conducting an unclothed search. Id. at 954-55 (citing Bell, 441 U.S. at 559 n. 40). Given the history of contraband and the fact that searches, although evasive, were conducted privately, safely, and professionally, the court concluded that visual body-cavity searches were reasonable.

Based upon this authority, this Court finds that under the standards articulated in Bell, the visual unclothed body policy and searches of plaintiffs by the DHS at the Annex, Complex 1 and the BTU, did not violate the Fourth Amendment as a matter of law. First, the DHS Defendants presented legitimate governmental interest for the searches. The Moose Lake Facility is a secured facility for individuals who have been civilly committed as sexual psychopathic personalities and sexually dangerous persons. See Affidavit of David S. Prescott, LICSW, ¶ 2. As such, the patients in the Program pose a sufficient security risk to other patients, staff members and the public to support the MSOP's legitimate security concerns of ensuring that contraband did not enter the Program, and to preventing injuries and escapes. Indeed, plaintiffs do not dispute that the security interests articulated by the DHS Defendants, and the Eighth Circuit has found that the maintenance of security in detention facilities, including the Moose Lake Facility which houses sexually violent persons, is a legitimate government interest. See Serna, 567 F.3d at 946 (citations omitted).

Second, the DHS Defendants have presented a legitimate justification for the searches. The articulated purpose of the unclothed body searches was to protect transport teams and the public when patients leave the MSOP's facilities and to protect staff and patients from the dangers posed by contraband that could be smuggled into

MSOP facilities.  See Oberg Aff., Ex. 15 (Johnson Dep.) at p. 23.  The MSOP has had a history of patients secreting upon themselves contraband that could be used in assisting in an escape during a transport, such as a wire, a fashioned key that could be used to open cuffs, and glass.  Id. at pp. 23-24.  The MSOP had high profile escapes occurring in 2005 and 2006.  Id., Ex. 10 (Benson Dep.) at pp. 9-10, 13.  Another escape took place in 1995.  Id., Ex. 11 (Carlson Dep.) at p. 36.  There has also been a history of escape attempts, shootings, murders and hijackings, when patients have hijacked a transport because a patient had handcuff keys or a soup bar shaped as a gun.  Id., Ex. 10 (Benson Dep.) at pp. 24-25; Ex. 13 (Erskine Dep.) at p. 20.  Escape paraphernalia, including hacksaws, have been smuggled into the MSOP facilities.  Id., Ex. 10 (Benson Dep.) at pp. 24-25; Ex. 11 (Carlson Dep.) at p. 36.  Further, drugs have been found in the MSOP facilities, including on Beaulieu. Id., Ex. 5 (Beaulieu Dep.) at p. 66; Ex. 10 (Benson Dep.) at p. 25; Ex. 15 (Johnson Dep.) at p. 24.

Plaintiffs complained that it was not reasonable to require an unclothed search before leaving the secured perimeter of a facility (e.g., to go from the Annex to the Main Building), because they could not imagine what a patient could take from a secured facility that would implicate facility security, and because in many cases, the trips in were short, thereby negating the possibility of escape.  See Pls.' DHS Opp. at pp. 39-40.  This argument ignores the history of escapes by patients from transports using items that they obtained from their facilities and secreted onto their person, including lock keys or items that can be used to open locks.  Further, the fact that some trips are short in duration does not mean that a patient cannot use items secreted in their persons in an attempt to escape, implicating not only the concerns of public safety but that of the staff involved in the transport.

Given the history of escapes and attempted escapes during transport outside of the Program's secured perimeter, the Court does not find the unclothed searches prior to transport, and even from the Annex to the Main Building, to be unreasonable.  See, e.g., Hoisington v. Williams, No. C09-5630 RJB/KLS, 2010 WL 3787120 at *8 (W.D. Wash. Aug. 16, 2010) (granting summary judgment in favor of defendant after concluding that the blanket strip search policy for committed sexual offender before and after transport to be reasonable).

With regards to the unclothed body searches performed after returning from outside the secured perimeter or after a contact visit, this Court finds that these searches are reasonable as a matter of law given the fact that the patients are interacting with individuals from outside the facility that could provide them with contraband.   Such searches after outside contact by patients are similar to those allowed by the Supreme Court in Bell, and the Eighth Circuit in Goff and Franklin.   In addition, at least one court in this district has ruled that the MSOP's unclothed searches to be constitutionally reasonable:

> Balancing the significant security interests of the institution against the privacy interests of Plaintiffs, see Bell, 441 U.S. at 1885, the Court does not find that MSOP's policy of requiring Plaintiffs to submit to an unclothed visual body cavity search after contact visits is unreasonable. The policy is in place in order to maintain a safe environment, is applied only after patients have a particular type of visit or contact, and similar searches have been upheld as constitutional by the Supreme Court and the Eighth Circuit. The Court recommends that Plaintiffs' claims regarding the unclothed visual body cavity searches be dismissed.

Semler, 2010 WL 145275 at *21 (granting defendants' motion to dismiss).[10]

---

[10]     Plaintiffs attempt to distinguish Selmer on the basis that the court did not understand that the full extent of the strip search policy (i.e., that it was not just used after a particular type of visit or contact), (Pls.' DHS Opp. at p. 42), is a distinction

Third, the Court acknowledges that while visual body searches by their very nature are a highly intrusive procedure (as opined by plaintiffs' expert, Fred S. Berlin (O'Neill Aff., Ex. 42 ("Berlin Report") at p. 4), this Court finds that a separate visual search of each patient by male or female staff[11] in private, with no touching, is reasonable in scope, manner and location.

Similarly, plaintiffs' position that the MSOP searches were not reasonable, as MSOP staff does not attempt to utilize less intrusive searches, Pls.' DHS Opp. at pp. 39-40), is rejected. Defendants testified that a less intrusive method of searching, such as a hand patdown over clothing, was not an effective search method as unclothed searches because small items can be missed and there are various places that cannot be searched as part of a pat down. Id., Ex. 14 (Hattenberger Dep.) at p. 18; Ex. 17 (Mooney Dep.) at p. 44. The MSOP also considered using metal detectors and a body orifices scanning chair, but realized that these technologies only detected metal and that not all contraband is metal. See Prescott Aff., ¶ 13.

---

without a difference. The rationale for upholding the strip search policy is the same whether the search takes place before or after transport and that is the legitimate security concerns of maintaining the safety of those who come in contact with the patients.

[11]    DeLaney asserted that he once had a female staff person who assisted in the unclothed search on December 2, 2008 and that he witnessed a female staff member monitoring a camera feed from a search of Beaulieu in November of 2008. See O'Berg Aff., Ex. 8 (DeLaney Dep.) at pp. 10-12. Visual surveillance of male inmates by female guards does not violate the inmates' right to privacy. See Timm v. Gunter, 917 F.2d 1093, 1102 (8th Cir. 1990). "Whatever minimal intrusions on an inmate's privacy may result from such surveillance, whether the inmate is using the bathroom, showering, or sleeping in the nude, are outweighed by institutional concern for safety and equal employment opportunities." Id. (citation omitted).

As for the MSOP's policy of performing unclothed body searches of patients where a patient refuses to submit to a search,[12] which can only take place after advance consent from the Executive Director or a designee, upon "reasonable suspicion of imminent substantial risk to the safety or health of a patient, or to the security of the facility," and in the presence of a health services staff member, <u>Goff</u> instructs that such a search is not unreasonable.  In <u>Goff</u>, the body search policy that was upheld included a provision that allowed staff doctors or assistants to conduct a search of the detainee's oral cavities upon their refusal to be searched, if there was evidence present of contraband, or in other words, if it was "reasonably ascertained" that contraband could be found.  <u>See Goff</u>, 366 F.2d at 366, 377.  Here, there was a similar progression of placing the patient in protective surveillance, conducting less intrusive forms of screening and only conducting a staff-assisted search with permission of the appropriate authority if there is "reasonable suspicion of imminent substantial risk" to a patient or the facility.  If the Court were to exclude this portion of the policy, it would eviscerate the purpose of the unclothed policy, which is to discover and deter the flow of contraband.  As the Eighth Circuit stated in <u>Goff</u>:

> More importantly, the search is strictly a visual search unless either the contraband itself or evidence indicating the presence of contraband in that area is observable, in which case the inmate is held until he can be examined by a physician or a physician's assistant. We simply fail to perceive how a distinction can be drawn between the anal and genital regions for Fourth Amendment purposes and, were we to uphold the injunction issued in the present case, could see no principled basis for not extending it to cover the genital region were some challenge mounted to that portion of the strip search policy. Such a result would disrupt well-established security procedures in our prison systems and

---

[12]     This Court notes that plaintiffs have not presented any evidence that they have been subjected to a staff-assisted search after the implementation of the policy.

> would no doubt engender greatly increased attempts to
> smuggle contraband in what would have become specific
> bodily areas accorded a preferred position under the Fourth
> Amendment.

Id. at 366.

Without the threat of a staff assisted search, albeit only one where there was some sort of evidence to support a reasonable suspicion of a substantial security risk, patients could routinely refuse to undergo the unclothed strip search, and just wait out the surveillance in order to introduce contraband.

For all of these reasons, the Court finds the MSOP's unclothed full body searches to be constitutionally reasonable and therefore, defendants' motions for summary judgment as it relates to this claim should be granted.[13]

### D.   The Staff-Assisted Unclothed Search of Yazzie

Yazzie testified that he was subjected to a staff-assisted search (prior to the implementation of the July 2009 staff-assisted search policy) on February 2, 2009, based on his refusal to submit to an unclothed search after he had allegedly assaulted another patient.  See O'Berg Aff., Ex. 9 (Yazzie Dep.) at pp. 31-34.  To conduct the search, Yazzie was restrained and placed on the floor and the staff members removed his clothing.  Id. at p. 35.  Yazzie asserted that he resisted the search by not moving. Id. at pp. 35-36.  Staff rolled him from side to side in order to wand him.  Id. at p. 36. Staff did not look inside of Yazzie's mouth nor were his buttocks spread.  Id.  None of the named defendants were involved in the search.  Id. at pp. 33-34.

Benson, Executive Director of the MSOP during the incident, testified that he vaguely recalled an incident involving Yazzie's forced unclothed search of February 2,

---

[13]      Given that the Court has concluded the searches present no constitutional violation, this Court does not reach the DOC's argument regarding its lack of involvement in the implementation of DHS's body search policies at the Annex.

2009. <u>See</u> Oberg Aff., Ex. 10 (Benson Dep.) at p. 28.  Benson indicated that there was

an investigation and discipline as a result of this search.  <u>Id.</u> at pp. 28-29.  Carlson, the

Moose Lake Program Director at the time, stated that he was unsure whether staff

violated MSOP procedure when they conducted the forcible search of Yazzie, but that

he did not authorize the search.  <u>Id.</u>, Ex. 11 (Carlson dep.) at pp. 28-30.

A supervisor cannot be held vicariously liable for the unconstitutional actions of a

subordinate, as the doctrine of respondeat superior does not apply to § 1983 claims.

<u>See</u> <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1948 (2009) ("Because vicarious liability is

inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official

defendant, through the official's own individual actions, has violated the Constitution.");

<u>Monell v. Department of Social Services</u>, 436 U.S. 658, 694 (1978).  The general

responsibility for supervising a facility is not sufficient to establish personal liability.  <u>See</u>

<u>Estate of Rosenberg by Rosenberg v. Crandell</u>, 56 F.3d 35, 37 (8th Cir. 1995) (citing

<u>Ouzts v. Cummins</u>, 825 F.2d 1276, 1277 (8th Cir. 1987)).  "[A] supervising officer can be

liable for an inferior officer's constitutional violation only 'if he directly participated in the

constitutional violation, or if his failure to train or supervise the offending actor caused

the deprivation.'"  <u>Parrish v. Ball</u>, 594 F.3d 993, 1001 (8th Cir. 2010) (quoting <u>Otey v.</u>

<u>Marshall</u>, 121 F.3d 1150, 1155 (8th Cir. 1997), quoting <u>Tilson v. Forrest City Police</u>

<u>Dep't</u>, 28 F.3d 802, 806 (8th Cir. 1994)).

Yazzie has admitted that none of the DHS Defendants directly participated in the

assisted unclothed search.  Plaintiffs also failed to provide any evidence that defendants

authorized the search, or that a failure to train or supervise the offending staff

member(s) by defendants led to the forced search.[14]  Indeed, a failure to train or supervise was not even pled by plaintiffs in the Amended Complaint.  As such, defendants' motions for summary judgment should be granted as it relates Yazzie's staff-assisted unclothed search.

### E.   Use of Restraints

Plaintiffs claimed that defendants violated the Fourth Amendment by requiring plaintiffs to be handcuffed and shackled during transports from the Annex or other Moose Lake facilities.  See Amended Complaint, ¶¶ 20, 30.

Since July 12, 2006, the MSOP has used full restraints during transport of patients, with exceptions granted on a case-by-case basis due medical considerations.  See Oberg Aff., Ex. 12 (Considine Dep.) at p. 17, Dep. Ex. 3 (July 12, 2006 Memo from Erskine to all Patients); Ex. 13 (Erskine Dep.) at pp. 19-20; Ex. 14 (Hattenberger Dep.) at pp. 31-32; Ex. 16 (Linkert Dep.) at p. 17; Ex. 17 (Mooney Dep.) at p. 41.  Full restraints, placed on patients anytime they travel outside of the secured perimeter, include handcuffs, a black box, a wrist chain, and leg irons.  See O'Neill Aff., Ex. 4 (Bush Declaration), ¶ 10; Ex. 49 (MSOP Policy 301.095); Ex. 50 (MSOP Policy 301.090); Ex. 51 (MSOP Policy 301.090ALL); Oberg Aff., Ex. 5 (Beaulieu Dep.) at pp. 43-45; Ex. 7 (Gimmestad Dep.) at pp. 13-14; Ex. 8 (DeLaney Dep.) at pp. 14-15; Ex. 9 (Yazzie Dep.) at p. 21; Ex. 13 (Erskine Dep.) at p. 36.

The MSOP does not make an individualized determination of risk to ascertain whether to apply the restraints to a particular patient because when it attempted to do

---

[14]   The only evidence of any involvement that this Court could find was a mention that Hattenberger, Director of Annex Unit E, was running the video camera movement during the incident. See O'Neill Aff., Ex. 48 (Incident Report).

so in the past, it resulted in an attempted escape.  <u>See</u> Oberg Aff., Ex. 13 (Erskine Dep.) at p. 20; Ex. 16 (Linkert Dep.) at pp. 17-18.

A patient may refuse to wear restraints, but then the transport of the patient is denied.  <u>See</u> O'Berg Aff., Ex. 11 (Carlson Dep.) at p. 46.  Exceptions for medical transports can be made—<u>i.e.</u>, for medical emergencies.  <u>See</u> O'Berg Aff., Ex. 13 (Erskine Dep.) at p. 20; Ex. 14 (Hattenberger Dep.) at p. 31.

This restraint policy was instituted because of security problems in the form of escapes and attempted escapes by patients, which threatens the public and MSOP staff safety.  <u>See</u> O'Berg Aff., Ex. 13 (Erskine Dep.) at p. 20; Oberg Aff., Ex. 17 (Mooney Dep.) at p. 42; Benoit Aff., ¶¶ 18-19; <u>see</u> <u>also</u> Section IV(C), <u>supra</u> (detailing the history of escapes from transports).  Restraints during transport are an accepted practice for maintaining the security of a patient, as there are less security staff available outside of the perimeter and there are not as many barriers to escape.  <u>See</u> Benoit Aff., ¶ 19. Even with the use of partial restraints (<u>i.e.</u>, no leg restraints), patients have been known to attempt escape.  <u>See</u> Oberg Aff., Ex. 11 (Carlson dep.) at pp.  43-44.

MSOP staff underwent training programs to ensure that they were applying restraints properly so as to avoid injuries.  <u>See</u> O'Berg Aff., Ex. 13 (Erskine Dep.) at pp. 30-31.

Delaney provided in his declaration that he was placed in full restraints despite the fact that he has carpal tunnel and the handcuffs and box hurt his wrists and made his hands go numb.  <u>Id.</u>, Ex. 5 (DeLaney Decl.), ¶ 3.

Yazzie testified that he was injured during his transport from St. Peter to the Annex in January 2007, as the direct result of tight handcuffs.  <u>See</u> Oberg Aff., Ex. 9 (Yazzie Dep.) at p. 22.  Yazzie complained to the transporting staff that he could not

move his arm and that there was something wrong with his wrists up to five minutes after leaving St. Peter. Id. at pp. 23-24. The transport staff told Yazzie that they had to keep going and threatened to place him in protective isolation. Id. at p. 23. Prior to leaving St. Peter, Yazzie complained about the handcuffs being too tight, however, the unit coordinator conducted a space check on the cuffs and found that they were properly placed. Id. at p. 23. Yazzie testified that after the cuffs were removed, he noticed red marks and swelling on his wrists and scrapped skin, with no feeling up to his elbow. Id. at p. 24. There was no bleeding caused by the cuffs and the only treatment received for the injury was some ice. Id. Hattenberger testified that he saw Yazzie's wrist after he was transported to the Annex and noted some marking or discomfort on Yazzie's wrists. Id., Ex. 14 (Hattenberger Dep.) at p. 32. Yazzie did not take any pain killers for the injury. Id. Ex. 9 (Yazzie Dep.) at p. 25. According to Yazzie, the discomfort lasted two to three hours after arriving at the Annex. Id. He still experienced a little soreness the next day, but Yazzie testified that he did not ask for anything to relieve the discomfort. Id. at p. 26.

The DHS Defendants argued that the use of restraints on patients, who pose a safety risk to others, is reasonable for Fourth Amendment purposes given the history of escapes. See DHS Mem. at pp. 41-42. The DOC Defendants asserted that they had no involvement with the MSOP's restraint policy. See DOC Mem. at p. 12.

In opposition, plaintiffs contended that the requirement that they be forced to wear handcuffs, a black box, a waist chain and leg irons during transport is unreasonable because no individualized assessment on the level of restraint required is made as to each patient and destination. See Pls.' DHS Opp. at pp. 43-47. Plaintiffs also asserted that they do not understand how the use of these restraints would have

prevented escapes that have occurred in the past.   Id. at p. 46.   As to the DOC Defendants, plaintiffs submitted that the MSOP followed the DOC's policies as it related to the use of black boxes as a restraint.   See Pls.' DOC Opp. at p. 7.

The test as to whether a governmental action is appropriate under the Fourth Amendment in this context is whether the "offending" action is reasonable given the rights of the plaintiffs and the interests of the Program.   See Bell, 441 U.S. at 559; see also Youngberg v. Romeo, 457 U.S. 307, 324 (1982) (holding that a committed individual "enjoys constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests.") (emphasis added); United States v. Slater, 411 F.3d 1003, 1006 (8th Cir. 2005) ("The touchstone of the Fourth Amendment is reasonableness.").

Based on the reasoning articulated by the MSOP for the use of restraints—to address the safety of staff and the public, and to prevent escapes and attempted escapes, which have occurred in the past—this Court finds that the restraint policy is not unreasonable.   Cf., Semler, 2010 WL 145275 at *26-27 (finding on a motion to dismiss that the MSOP full restraint policy did not violate the substantive component of the Due Process Clause).   Further, the Court will not second guess the DHS Defendants' decision to not make an individualized risk determination on the use of restraints, where such attempts have previously failed and resulted in an escape.   "[I]t is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." Youngberg, 457 U.S. at 321 (citation and marks omitted).   The MSOP must be accorded "deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and

discipline and to maintain institutional security." Bell, 441 U.S. at 547 (citations omitted). The use of the "full" restraints on persons who have been segregated from society because of their perceived danger to the public, when these individuals leave to secured perimeter, is not unreasonable. Courts cannot insert their opinions into whether handcuffs may be suitable for some patients, while others need to wear handcuffs and leg irons, or whether others should also wear a black box, just as courts cannot micromanage the MSOP by determining the distance of a transport and the resulting necessary restraints.

For all of the reasons stated above, defendants' motions for summary judgment as it relates to plaintiffs' restraint claim should granted and the claim dismissed with prejudice.[15]

---

[15] As this Court has concluded the DHS's restraint policy does not present a constitutional violation, it need not reach the DOC's argument regarding its lack of involvement in the development and implementation of this policy at the Annex. However, even if plaintiffs had established that the restraint policy was unconstitutional, the record does not include any evidence that the DOC Defendants required the MSOP to adopt the restraint policy at issue. While Warden Carlson shared the DOC's policies regarding security in the hope that the MSOP would adopt them, this does not demonstrate that the DOC required the MSOP to adopt any particular restraint policy. See Nelson Aff., Ex. 4 (T. Carlson Dep.) at pp. 25-28.

For the same reason, the Court does not reach the claims by plaintiffs regarding the use of restraints on DeLaney and Yazzie. DeLaney provided in his declaration that he was forced to be placed in full restraints despite the fact that he has carpal tunnel and the handcuffs and black box hurt his wrists and made his hands go numb. See O'Neill Aff., Ex. 5 (DeLaney Decl.), ¶ 3. Yazzie testified that he suffered some redness and redness during one transport based on the tightness of the hand cuffs. See Oberg Aff., Ex. 9 (Yazzie Dep.) at pp. 22-26. Plaintiffs did not allege an excessive use of force claim in their Amended Complaint as to DeLaney and Yazzie. In any event, summary judgment on such a claim would be appropriate because based on the record before this Court, no reasonable jury could have found the MSOP, let alone the named defendants, used excessive force in securing the restraints, where they did not "present any medical records indicating [they] suffered any long-term or permanent physical injury as a result of the handcuffs." Crumley v. City of St. Paul, 324 F.3d 1003, 1008 (8th Cir. 2003) (summary judgment claim granted on excessive-force claim where

F.    **Seizure of 20-Inch Televisions**

Plaintiffs claimed that DHS defendants Considine and Hattenberger at the direction of DHS defendants Johnson, Mooney, Erskine and Ludeman, along with the DOC Defendants, Fabian and Terry Carlson, arbitrarily seized 20-inch televisions purchased by Program detainees at the Annex, and required them to send them away at their own expense in order to comply with a DOC Policy that permitted only 13-inch clear televisions on DOC property.  See Amended Complaint, ¶ 21.   According to plaintiffs, these actions constituted unreasonable seizures in violation of the Fourth Amendment. Id.

On July 12, 2006, Erskine sent a memo to all patients notifying them that the size of televisions permitted by the MSOP would be reduced to 13 inches.  See Oberg Aff., Ex. 12 (Considine Dep.) at p. 17, Dep. Ex. 3 (July 12, 2006 Memo from Erskine to all Patients).  The purpose of this change was to accommodate the size of the shelf in the patients' rooms upon which televisions were placed—they could safely hold a 13-inch television–and a clear television that could make contraband harder to hide, was only available in this size.  Id., Ex. 15 (Johnson Dep.) at p. 31; Ex. 17 (Mooney Dep.) at p. 51.  The shelves came with the existing bunks in the Annex when the MSOP moved into the DOC's space.  Id., Ex. 15 (Johnson Dep.) at p. 31.  There were no discussions between the MSOP and the DOC regarding the size of televisions in the Annex.  Id.

On August 16, 2006, MSOP Residential Program Director Rose Smith sent a memo to patients and staff, which provided that televisions 20-inches or smaller were allowed, but that any new televisions coming into the facility could be no larger than 13

---

plaintiff alleged defendants handcuffed her "so tightly that they made one of her hands bleed").

inches. See O'Neill Aff., Ex. 54. On March 13, 2007, David Pingry, Site Director of the Moose Lake Main Building sent a memo to staff and patients, which provided that effective immediately, patients could possess or order 13-inch translucent televisions or 17-inch LCD televisions. Id., Ex. 55. Patients who possessed televisions that did not conform with this new policy were required to devise a plan to have their televisions shipped out of the facility within 30 days. Id. Failure to send the televisions out would result in the disposal of the televisions. Id.

On July 24, 2007, Erskine sent out another memo to patients and staff to clear up any confusion regarding the new patient television policy. Id., Ex. 56. The memo provided that patients were allowed 13-inch televisions or 19-inch LCD flat screen televisions in their rooms. Id. These were the only televisions that were permitted, and all other televisions were to have been shipped out by this point in time. Id. Patients who had not done so were required to provide a plan within five days as to how they were going to ship out the non-conforming televisions and had 30 days to have the televisions sent out. Id. If the 30 days expired without the television sent out, then the television would be destroyed by MSOP staff. Id.

MSOP paid to have patients' non-conforming televisions sent outside for a period of time. See Oberg Aff., Ex. 13 (Erskine Dep.) at p. 22; Ex. 16 (Linkert Dep.) at p. 51; Ex. 17 (Mooney Dep.) at pp. 51-52.

Gimmestad, Yazzie and Beaulieu III all possessed non-conforming televisions. See O'Berg Aff., Ex. 4 (Beaulieu, III Dep.) at pp. 11-12; Ex. 7 (Gimmestad Dep.) at p. 14; Ex. 9 (Yazzie Dep.) at p. 40. Gimmestad set up a plan to send out his television, but did not avail himself during the period of time that the MSOP paid to send out televisions. Id., Ex. 7 (Gimmestad Dep.) at p. 14. Gimmestad sent out his television a

year after making his plan at a cost of $20.  Id. at pp. 14-15.  Yazzie paid to send his

television out and did not take advantage of having the MSOP pay for it out because he

was told at a community meeting that he could keep his larger television.  Id., Ex. 23

(Yazzie Dep.) at pp. 40-41.  Beaulieu III had the MSOP dispose of his television

because no one from his family wanted it and was he charged $21 by the MSOP for

recycling the television.  Id., Ex. 4 (Beaulieu III Dep.) at p. 12.

The DHS Defendants argued that plaintiffs' Fourth Amendment seizure claim as

it relates to the seizure of their 20-inch televisions is without merit, as patients do not

have a constitutional right to possess a television and because the seizure of the

television was constitutionally reasonable based on safety and security considerations.

See DHS Mem. at p. 43.  The DOC defendants asserted that plaintiffs' claim against

them is without merit, as they had nothing to do with the seizure of the televisions.  See

DOC Mem. at pp. 12-13.  Plaintiffs submitted that the DHS Defendants' seizure

interfered with their possessory interests and that the DHS's rationale was

unreasonable given that it was based on the space and size of the shelf, as opposed to

concerns of institutional security.  See Pls.' DHS Opp. at p. 49.  As to the DOC's motion,

plaintiffs claimed that it was the DOC that supplied the shelves that resulted in the policy

at issue.  See Pls.' DOC Opp. at p. 13.

The Fourth Amendment provides that the "right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures

shall not be violated."  U.S. Const. amend. IV.  Personal property, such as televisions,

are personal "effects" protected by the Fourth Amendment.  See Pepper v. Village of

Oak Park, 430 F.3d 805, 809 (7th Cir. 2005) (citations omitted); see also Oliver v.

United States, 466 U.S. 170, 177 n. 7 (1984) ("The Framers would have understood the

term 'effects' to be limited to personal, rather than real, property."). A 'seizure' of property . . . occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'" Soldal v. Cook County, 506 U.S. 56, 61 (1992) (quoting United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)); see also United States v. Va Lerie, 424 F.3d 694, 701 (8th Cir. 2005) (a "seizure is defined as some meaningful interference with an individual's possessory interests in his property.").

"To determine the constitutionality of a seizure we must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Baribeau v. City of Minneapolis, 596 F.3d 465, 483 (8th Cir. 2010) (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985)) (internal quotation and brackets omitted)). When an institutional restriction infringes a specific constitutional guarantee,"-here, the Fourth Amendment right against unreasonable seizures,-"the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." Bell, 441 U.S. at 546.

This Court has already concluded that plaintiffs' had possessory rights in their televisions that are protected by the Fourth Amendment and that by requiring plaintiffs to part with those televisions, there was a seizure. See Beaulieu v. Ludeman, No. 07-CV-1535 (JMR/JSM), 2008 WL 2498241 at *15-16 (D. Minn. June 18, 2008) (Order adopting Report and Recommendation [Docket No. 47] dated Feb. 7, 2008). At the same time, the Court left open for another day the determination as to whether MSOP's policy unlawfully interfered with those rights. Id.

Now with the benefit of the record developed by the parties, this Court concludes that the seizure of the 20-inch televisions did not constitute an unreasonable intrusion on plaintiffs' rights to their television. The rationale for requiring 13 inch "clear" televisions (or 17 or 19 inch LCD flat screen televisions) was two-fold: (1) the size of the shelf in patients' rooms upon which televisions would be placed, could safely hold such televisions; and (2) a clear television (or LCD television) would make contraband harder to hide, and was only available these sizes. Given the concern about larger televisions falling off the smaller shelves, which implicates patient safety, and the interest of preventing the concealment of contraband, requiring patients to dispose of their non-conforming televisions is a reasonable intrusion.

Further, the DHS gave Gimmestad, Yazzie and Beaulieu III adequate notice of the change in policy and the ability to obtain reimbursement for sending the non-conforming televisions out of the facility.

For all of the reasons stated above, this Court finds that defendants' motions for summary judgment on plaintiffs' television claim should be granted and the claims be dismissed with prejudice.[16]

G.   **Legal Mail**

Plaintiffs claimed that DHS defendants Considine and Hattenberger at the direction of DHS defendants Johnson, Mooney, and Erskine, along with the DOC

---

[16]   As this Court has concluded the DHS's television policy does not present a constitutional violation, it need not reach the DOC's argument regarding its lack of involvement in this policy at the Annex. However, even if plaintiffs had established that the television policy was unconstitutional, the record establishes that the shelves were already in place on the bunks when the MSOP moved into the Annex space, and there is no evidence of any discussions between the MSOP and the DOC regarding the size of televisions in the Annex. The fact that the MSOP conformed its policies to the DOC facilities does not equate to the DOC intentionally interfering with the patients' possessory interest in a television.

Defendants, Commissioner Fabian and Warden Carlson, directed staff to open and inspect clearly marked incoming legal mail, outside of the presence of civilly committed detainees.  Id., ¶¶ 22, 31.  Plaintiffs claimed this conduct violated their rights under the Sixth and Fourteenth Amendments.  Id., ¶ 31.

At least as of 2004, the MSOP required any incoming mail that tested positive for metal to be checked by staff before being provided to patients.  See Oberg Aff., Ex. 17 (Mooney Dep.), Dep. Ex. 3 (Patient Mail Procedures for the MSOP).  This policy also required that packages (defined as "any item of mail larger than a #10 business envelope or thick and heavy enough to require additional postage") be opened by the patient in the presence of staff.  Id.  From monitoring patients' telephone calls, the MSOP discovered that patients were using the mail to receive contraband and inappropriate correspondence.  Id., (Mooney Dep.) at pp. 20-21.  On April 25, 2006, the MSOP issued a memo that the Office of Special investigations ("OSI") would be opening and inspecting incoming and outgoing non-legal mail for contraband.  Id., (Mooney Dep.), Dep. Ex. 4 (April 25, 2006 Memo from Mooney to Patients).  On July 16, 2006, another memo was issued communicating to patients "upcoming changes," including that all mail would be processed through the mail room and checked for contraband prior to distribution.  Id., Ex. 12 (Considine Dep.) at p. 16, Ex. 3 (July 16, 2006 Erskine Memo).  Erskine explained that this policy was the same as the previous policy – that is, all incoming and outgoing mail arriving into the mail room would be sorted, and excluding legal mail, would be opened and checked for contraband.  See Oberg Aff., Ex. 13 (Erskine Dep.) at p. 16.  As for incoming legal mail, it would be scanned for metal and if metal was present, it was to be opened by staff in the presence of the patient, staff would look for metal and any other contraband but not read the contents, and then

hand the non-contraband materials over to the patient.  Id. at p. 17; Ex. 16 (Linkert Dep.) at pp. 30-32.

Johnson testified that if any mail, including legal mail, tested positive for metal, it was opened at the Annex's secured perimeter, but did not specifically testify if opening of legal mail was done outside of a patient's presence.  See O'Berg Aff., Ex. 15 (Johnson Dep.) at pp. 63-64.  Considine testified that it was policy to open legal mail at the Annex perimeter if it wanded positive for metal, and that at in one instance, it was opened at the perimeter outside of Beaulieu's presence.  Id., Ex. 12 (Considine Dep.) at pp. 18, 20.

Packages directed to patients at the Annex initially came through the DOC's perimeter gate and pursuant to both DOC and MSOP policy, were handled and searched by either MSOP or DOC personnel.  See Oberg Aff., Ex. 16 (Linkert Dep.) at p. 28; O'Berg Aff., Ex. 11(Carlson Dep.) at pp. 53-54, 65-66; Ex. 17 (Mooney Dep.) at pp. 21-23. Warden Carlson testified that she did not know about legal packages, that a "package was a package", and provided that legal mail for prisoners incarcerated by the DOC would be opened in their presence.  See Nelson Aff., Ex. 4 (T. Carlson Dep.) at pp. 65-66.

In June 2009, the MSOP issued a new mail policy, which provided that all incoming mail, except privileged mail, would be opened and visually inspected by MSOP staff for unallowable mail or items.  Id., Ex. 37 (MSOP Policy 302.030) at p. 3. "Mail" was defined to include letter and packages.  Id. at p. 1.  "Privileged mail" was defined to include "legal mail."  Id.  "Legal mail" was defined to include "correspondence to or from court, court staff, verified attorneys and established groups of attorneys involved in representing patients in judicial proceedings."  Id.  All incoming packages

were to be opened and inspected by staff, and then routed to the property department for distribution. Id. at p. 3.

Beaulieu identified three instances where his legal mail was opened outside his presence: (1) an envelope from the Unites States Marshal's Office was opened while he was housed at the Annex; (2) he received correspondence at the Annex from the United States District Court that contained papers, which had a staple removed; and (3) a letter from Frank Bibeau, Beaulieu's civil commitment attorney, was opened while Beaulieu was in the BTU. See Oberg Aff., Ex. 5 (Beaulieu Dep.) at pp. 30-32; See O'Neill Aff., Ex. 44 (Affidavit of Wallace James Beaulieu) at p. 3 (stating when the complaint for the instant suit was returned to him for the purpose of submitting separate affidavits to proceed in forma pauperis, the envelope was opened and the staples removed). Beaulieu testified that staff told him that the mail he had received at the Annex had been opened pursuant to the DOC's policy requiring a letter containing metal to be opened at the Annex gate prior to coming into the secured perimeter. Oberg Aff., Ex. 5 (Beaulieu Dep.) at p. 32.

Yazzie testified that legal mail sent by the "court administrator" pertaining to the Religion Suit, was opened in the Annex outside of his presence however, he could not recall what pieces of mail had been opened. Oberg Aff., Ex. 9 (Yazzie Dep.) at pp. 26-27. Yazzie was told that his mail was opened because it had wanded positive by the DOC for the presence of metal. Id. at p. 28.

Beaulieu III testified that when he opened legal mail, he did so in front of MSOP staff. Oberg Aff., Ex. 4 (Beaulieu III Dep.) at p. 13. Beaulieu III also testified that his legal mail was opened outside of his presence, including at least one unidentified piece of mail from his civil commitment attorney, but he could not recount the number of

times.  Id. at pp. 13-14.  The only explanation he received was that the mail was opened due to DOC policies, and that the packages had metal in them.  Id. at p. 14.

Gimmestad testified that he could recall three pieces of legal mail that had been opened outside of his presence: (1) one from his civil commitment attorney; (2) one from the Attorney General's office; (3) and one from the Bureau of Criminal Apprehension Registration Office.   Oberg Aff., Ex. 7 (Gimmestad Dep.) at p. 15. Gimmestad also stated that he had opened legal mail in front of MSOP staff.  Id. at p. 16.  Gimmestad testified that the opening of the letters did not cause him to miss a deadline, have a claim dismissed or cause him to get an adverse judgment.  Id. at pp. 16-17.

DeLaney testified at his deposition that in 2006, a court sent back a complaint in a property case because it had two pages missing.  Id., Oberg Aff., Ex. 8 (DeLaney Dep.) at p. 17.  DeLaney stated that when he sent the complaint to the court all of the pages were present and that the two pages were destroyed in Moose Lake.  Id. at pp. 17-18.  DeLaney could only recall that his complaint dealt with a property case and he could not remember the court to which he had sent the complaint.  Id.   In all, DeLaney stated that he had legal mail opened outside of his presence in 80 separate instances including: (1) a letter from the Attorney General's office: (2) a letter from his civil commitment attorney; (3) a letter from the ACLU; and (4) a letter from his cousin, a federal judge, who was providing DeLaney advice on a complaint he was intending to file.  Id. at p. 20.  DeLaney testified that his cousin, the judge, communicated to him that there were pages missing from the complaint.  Id.  DeLaney asserted that the only explanation he received regarding staff opening his legal mail was that it was an

accident. Id. at p. 19. DeLaney also testified that he had opened legal mail in front of MSOP staff. Id. at p. 21.

MSOP staff was aware of complaints by patients that legal mail was being opened outside of the presence of patients and of rare instances where legal mail was opened inadvertently. Oberg Aff., Ex. 11 (Carlson Dep.) at p. 80-81; Ex. 13 (Erskine Dep.) at p. 18; Ex. 14 (Hattenberger Dep.) at pp. 35, 38-39.

The DHS Defendants did not deny that legal mail has been opened outside of patients' presence. See DHS Mem. at pp. 44-45. Indeed, the DHS Defendants have admitted that they were aware of complaints by patients that legal mail was being opened outside of their presence and of rare instances where legal mail was opened, albeit inadvertently. See O'Berg Aff., Ex. 11 (Carlson Dep.) at p. 80-81; Ex. 13 (Erskine Dep.) at p. 18; Ex. 14 (Hattenberger Dep.) at pp. 35, 38-39. However, the DHS Defendants argued that plaintiffs' mail claims should be dismissed because they have provided no evidence that the opening of legal mail has harmed their efforts to pursue non-frivolous legal claims. See DHS Mem. at pp. 44-45. In other words, the DHS Defendants asserted that because plaintiffs failed to allege any actual injury—e.g., inability to pursue a legal claim, missing of a deadline or affected them a "critical stage" in any legal proceeding—their Sixth and Fourteenth Amendment claims cannot survive. Id. at p. 45.

As to the DOC Defendants, they asserted that the DOC did not have a mail policy that applied to the MSOP nor did the DOC search patient mail. See DOC. Mem. at p. 13.

Plaintiffs disagreed, asserting that they were harmed by some unspecified unfair litigation advantage that defendants gained by opening their legal mail, they

experienced actual injury as evidenced by OSI's search of Beaulieu's room the day after his arrival at the Annex, and attorney-client communications have been chilled.  See Pls.' DHS Opp. at p. 36.  Further, plaintiffs maintained that because the DHS policies regarding inspecting mail packages and the Office of Special Investigation's mail monitoring are silent as to the protection of legal mail, summary judgment should be denied.  Id.

Regarding the DOC, plaintiffs argued that the evidence showed that DOC staff opened all packages at the perimeter of the Annex, including legal packages from patients and that MSOP staff told plaintiffs that their legal mail was opened pursuant to DOC policy.  See Pls.' DOC Opp. at p. 10.

"Privileged prisoner mail, that is mail to or from an inmate's attorney and identified as such, may not be opened for inspections for contraband except in the presence of the prisoner."  Jensen v. Klecker, 648 F.2d 1179, 1182 (8th Cir. 1981) (citing Wolff v. McDonnell, 418 U.S. 539, 576-77 (1974)); see also Travis v. Norris, 805 F.2d 806, 809 n. 1 (8th Cir. 1986) (citations omitted) ("An inmate's privileged legal mail may be opened in the inmate's presence to inspect for contraband."); Thomsen v. Ross, 368 F. Supp.2d 961, 974 (D. Minn. 2005) ("A jailer who opens a prisoner's legal mail outside of the prisoner's presence may violate a prisoner's constitutional rights.") (citations omitted). "Claims based on the opening of a prisoner's legal mail may be analyzed as violations of either the Sixth Amendment right to counsel, or the Fourteenth Amendment right to court access." Thomsen, 368 F. Supp.2d at 974 (citing Wolff, 418 U.S. at 576).

Under the First Amendment, the freedom to petition includes the right of access to courts (see BE & K Const. Co. v. N.L.R.B., 536 U.S. 516, 525 (2002) (citation

omitted)), and "[t]he due process clause of the Fourteenth Amendment makes the First Amendment applicable to the states." <u>Republican Party of Minnesota v. White</u>, 416 F.3d 738, 748 (8th Cir. 2005) (citing <u>McIntyre v. Ohio Elections Comm'n</u>, 514 U.S. 334, 336 n. 1 (1995)).  In order to state a claim for denial of access to the courts, an inmate must demonstrate that he incurred actual injury; in other words, the inmate must show that the alleged deprivations actually hindered his efforts to pursue a legal claim.  <u>Klinger v. Department of Corrections</u>, 107 F.3d 609, 617 (8th Cir. 1997) (citing <u>Lewis v. Casey</u>, 518 U.S. 343(1996)). This showing of prejudice is required of pretrial detainees, as well as prisoners.  <u>See</u> <u>Thomsen</u>, 368 F. Supp.2d at 974 (citation omitted).  Similarly, in order to prevail on a Sixth Amendment claim, plaintiffs must "show prejudice from any interference" of their mail.  <u>Id.</u>

Plaintiffs rely on <u>Cody v. Weber</u>, 256 F.3d 764 (8th Cir. 2001) for the proposition that the injury requirement is satisfied when prison administers have access to prisoner's legal papers.  <u>See</u> Pls.' DHS Opp. at p. 33.  In <u>Cody</u>, the pertinent facts were as follows:

> In his amended complaint, Cody does allege that he has been injured. He asserts that defendants have obtained an unfair advantage in defending themselves against his claims of constitutional denials and violations by reading his legal papers. He lists all of the various lawsuits he has filed challenging the conditions of his confinement, and he describes a number of instances in which his legal papers have been searched, copied, and read. In one such instance, Cody specifies the date the individual in charge of prison security showed Cody a copy of a letter from an attorney that had been copied without Cody's permission. We conclude that Cody has satisfied the Lewis requirement of alleging actual injury.

256 F.3d at 768.

The facts in <u>Cody</u> are distinguishable from the facts in the present case. Plaintiffs have not alleged in their mail claims (Amended Complaint, ¶¶ 22, 31)), that they have been injured by defendants' actions or that defendants have gained an unfair advantage in defending themselves in this case (or any other case) by reading their legal papers.   <u>See</u> <u>Chambers v. Gilmer</u>, No. 06-2026, Fed. Appx. 469, 2007 WL 1040330 at *1 (8th Cir. April 09, 2007) ("Specifically with regard to his access-to-courts claim, defendants' alleged actions did not prevent Chambers from asserting his rights in a lawsuit against the police officers who allegedly mistreated him, and Chambers did not allege the requisite actual injury from defendants' actions to state such a claim in any event."); <u>Sikora v. Hopkins</u>, No. 98-2033, 163 F.3d 603, 1998 WL 738327 at *1 (8th Cir. Oct. 23, 1998) (We agree that Sikora failed to state an access-to-courts claim because he failed to allege actual harm, . . .") (citations omitted).

Indeed, plaintiffs have not presented any evidence of actual harm caused by a violation of the MSOP's mail policy.   For example, with respect to the search of Beaulieu's room shortly after he was transferred to the Annex and the alleged copying of his legal papers, this alleged seizure had nothing to do with the MSOP's mail policy; it pertains to a search of his room as part of Beaulieu's retaliation claim, and Beaulieu did not present any injury caused by this conduct.

Similarly, with respect to the envelope from this Court that was returned to Beaulieu containing the initial Complaint, but opened and with the staples removed, unlike <u>Cody</u>, there is no evidence that any defendant, MSOP staff member or DOC staff member read or made a copy of the Complaint or any other materials in the envelope. Furthermore, plaintiffs have not suggested how defendants being aware of a complaint that plaintiffs were trying to serve on defendants hindered plaintiffs' access to the

courts.  See Thomsen, 368 F. Supp.2d at 974 ("Neither plaintiff nor his trial counsel have identified any conceivable way in which this information, even if read by jail officials, interfered with his defense or hindered his access to the courts. There is no suggestion that plaintiff's criminal case was resolved less favorably because the letters were opened.").

At the end of the day, it is plaintiffs' burden to show that the instances of mail opening outside of their presence prejudiced their ability to pursue a legal claim. Speculative assertions of harm, such as chilling of attorney-client communications, are not sufficient to overcome a motion for summary judgment on this issue.  See Hartsfield v. Nichols, 511 F.3d 826, 833 (8th Cir. 2008) ("Absent an articulation of how the alleged wrongful conduct actually blocked Hartsfield's access to filing a complaint, or caused a filed complaint to be deficient, Hartsfield's alleged injuries are merely speculative.").

In addition, there is no evidence of a systemic denial of patient's constitutional right of access to the courts by virtue of defendants' actions or the mail policies at issue. "A systemic denial of inmates' constitutional right of access to the courts is such a fundamental deprivation that it is an injury in itself."  Blaise v. Fenn, 48 F.3d 337, 340 (8th Cir. 1995) (marks and citation omitted).  As the United States Supreme Court has stated:

> [T]he essence of the [systemic] access claim is that official action is presently denying an opportunity to litigate for a class of potential plaintiffs. The opportunity has not been lost for all time, however, but only in the short term; the object of the denial-of-access suit, and the justification for recognizing that claim, is to place the plaintiff in a position to pursue a separate claim for relief once the frustrating condition has been removed.

Christopher v. Harbury, 536 U.S. 403, 413 (2002).  The systemic official action must frustrate a plaintiff or plaintiff class in preparing and filing suits at the present time.  Id.

Examples include claims seeking a law library for a prisoner's use in preparing a case and challenging filing fees that poor plaintiffs cannot afford to pay. Id. (citations omitted). In order to demonstrate a systemic denial of patient's constitutional right of access to the courts, a complete denial of access must be set forth. Jones v. James, 38 F.3d 943, 945 n. 4 (8th Cir. 1994) ("This case does not involve a systemic denial of access. The evidence shows that some mail to legal organizations has been allowed. Accordingly, Jones must show that he has suffered prejudice."); see also Sowell v. Vose, 941 F.2d 32, 35 (1st Cir. 1991) ("An absolute denial of access to all legal materials, like an absolute denial of access to a law library or other basic form of legal assistance, might be deemed inherently prejudicial, but this case does not involve such an unqualified deprivation.").

Here, plaintiffs have not directed the Court to any evidence that the mail policies generally prevented plaintiffs from seeking redress from the courts, let alone, any evidence that the policies have completely incapacitated plaintiffs from obtaining access to the courts or from obtaining legal advice.[17]

---

[17]     Plaintiffs cited to Bailey v. County of Kittson, NO. CIV 07-1939 (ADM/RLE), 2008 WL 906349 (D. Minn. March 31, 2008), in support of their assertion that summary judgment is not appropriate where an institution's policies are silent on the issue of whether mail inspection could occur outside of the presence of a prisoner. As an initial matter, is important to remember that the court in Bailey only found that the Complaint had stated a sufficient mail claim to survive a motion to dismiss. See Report and Recommendation 07-cv-01939-ADM-RLE [Docket No. 110] at pp. 7-8. More to the point, plaintiffs' argument is premised on their mistaken belief the policies governing inspection of mail packages and the Office of Special Investigation's mail monitoring are silent as to the protection of legal mail. MSOP Policy 302.030 explicitly defines mail to "packages," which under the plain language of the rule are subject to the rules on handling of privileged mail. See O'Neill Aff., Ex. 37 (MSOP Policy 302.030), pp. 1, 3 (privileged mail must be inspected in presence of patient). In addition, there has been no evidence supplied by plaintiffs that the MSOP has interpreted these policies to allow legal packages or legal mail intercepted by Office of Special Investigation to be opened outside of patients' presence. To the contrary, Carlson testified that he would not allow the Office of Special Investigation to monitor legal mail. See Oberg Aff., Ex. 11 (Carlson

Lacking any proof of a systemic denial of access to the courts and the failure to demonstrate prejudice, actual harm or injury as a result of the MSOP's mail policies, this Court finds that defendants' motions for summary judgment as it relates to plaintiffs' mail policy claim should be granted and the claims be dismissed with prejudice.[18]

H.     **Telephone Access**

Plaintiffs claimed that based on a policy created by DHS Defendant Ludeman, a phone system policy was put in place at the Moose Lake Facility that was indistinguishable from that used by the DOC phone systems, and which only allows for (1) outgoing and (2) monitored calls. See Amended Complaint, ¶¶ 23, 32.  As a result, plaintiffs cannot receive any incoming calls, including incoming calls from their attorneys. Id.  Days can pass before plaintiffs are allowed to return calls to their lawyers, which are generally restricted to 30 minutes.  Plaintiffs claimed that this telephone system violates their First Amendment right to telephone access. Id.

The DHS Defendants argued that summary judgment as to plaintiffs' access to telephone claim should be granted as its telephone policy was rationally related to legitimate security interests and the patients had alternative means to communicate. See DHS Mem. at pp. 46-47. Plaintiffs countered that the MSOP telephone policies and procedures which banned incoming calls altogether; monitored voicemail messages including those left by their attorney; placed restrictions on the length of all calls,

---

Dep.) at pp. 81-84.; see also Ex. 10 (Benson Dep.) at pp. 71-72.  Unlike Bailey, which was decided without the benefit of a record, here, plaintiffs have failed to present any proof that DHS Defendants, pursuant to MSOP Policy 302.030, have instructed staff to open legal mail outside of the presence of patients or allowed others to do so (including the Office of Special Investigation).

[18]     Given that the Court has concluded that plaintiffs have failed to make out a constitutional violation with respect to the DHS's mail policy, this Court does not reach that part of the DOC Defendants' motion regarding its lack of involvement in the Annex's mail policies.

including legal calls; and created unreasonable delays between a patient's request to make a privileged call and execution of the call, are unreasonable, and are not supported by any institutional justification.  See Pls.' DHS Opp. at pp. 51-54.  Plaintiffs also submitted that the additional restrictions placed on Beaulieu are unreasonable.  Id. at p. 54.  In short, plaintiffs are challenging generally the limitations of the MSOP phone policy on phone usage by patients, and specifically, as it relates to legal phone calls.

Under the MSOP's telephone policy, patients were allowed to use the telephone to communicate with persons outside of the Program, subject to being recorded.  O'Neill Aff., Ex. 58 (MSOP 302.210, effective 10/6/09); Ex. 59 (MSOP 302.210, effective 2/3/09); Ex. 60 (MSOP Policy 302.020, effective 11/20/08).  Patients were also given access to unrecorded and unmonitored telephone calls for the purpose of privileged communications.  Id.  Additionally, patients have access to a patient voice mail system by which individuals outside of the facility can leave messages, subject to the messages being recorded and monitored.  Id.  Because there is no way to distinguish between calls from attorneys and other calls when it comes to leaving voicemails, all voicemails are subject to monitoring.  Oberg, Aff., Ex. 11 (Carlson Dep.) at p. 18.  Callers leaving a message on the voicemail system are notified that messages may be monitored.  See Oberg Aff., Ex. 17 (Mooney Dep.) at pp. 42-43; Ex. 4 (Beaulieu III Dep.) at pp. 9-10; Ex. 5 (Beaulieu Dep.) at p. 51; Ex. 6 (Bush Dep.) at p. 18; Ex. 7 (Gimmestad Dep.) at p. 17; Ex. 8 (Delaney Dep.) at p. 23.  Routine telephone calls are limited to 15 minutes. Id., Exs. 59, 60.  Under the amended policy effective on October 6, 2009, prior to the connection of a patient-initiated telephone call, an introductory message is to be played notifying the recipient that the call is coming from a MSOP patient and that the call would be monitored and recorded.  O'Neill Aff., Ex. 58 at p. 2.

Privileged calls included "a patient telephone call to a verified attorney licensed to practice law." Id., Exs. 59, 60.  For privileged telephone calls, patients are required to request permission to place a privileged legal phone call using the MSOP Patient Request Form.  Id., Exs. 58, 59 at p. 3.  Privileged telephone calls are then facilitated and verified by staff.  Id.  Privileged calls are limited to 30 minutes, unless prior authorization is granted for a longer telephone call.  Id.  Patients in the BTU can make requests to their primary therapists to place a legal call.  See Oberg Aff., Ex. 18 (Ninneman Dep.) at pp. 14-15.  The legal therapist can grant the requests after verifying the call was a legal call.  Id. at p. 19.  Staff tries to set up a legal call as soon as possible, which is usually the same day as the request, or early the next day, depending on the availability of staff and when the request was received.  Id. at pp. 14-15.

The MSOP does not have a specific written policy regarding how soon a legal call must be returned by a patient; instead, calls are to be returned in a reasonable amount of time, so as to verify that the number is to a patient's attorney. Oberg Aff., Ex. 11 (Carlson Dep.) at p. 13; Ex. 17 (Mooney Dep.) at pp. 13, 16-18.  Usually the period is 1 to 2 days, but on occasion it has been on the same day and up to 5 days. Id., Ex. 5 (Beaulieu Dep.) at p. 59; Ex. 7 (Gimmestad Dep.) at pp. 18-19; Ex. 17 (Mooney Dep.) at pp. 13, 16-18; O'Neill Aff., Ex. 63 (November 2, 2009 MSOP Client Request Form by Beaulieu).  Staff takes into account the urgency of the call (i.e., if there is a pending court deadline), when making an assessment as to when a patient can make a legal call.  See Oberg Aff., Ex. 11 (Carlson Dep.) at p. 15.  According to the MSOP, delays are the result of staff receiving requests while they are dealing with other duties, the availability of the attorneys, the number of requests pending by other patients or other foreseen circumstances such as a lockdown or telephone issues.  See

Oberg Aff., Ex. 10 (Benson Dep.) at p. 19; Ex. 14 (Hattenberger Dep.) at pp. 46-47; Ex. 16 (Linkert Dep.) at p. 33; Ex. 17 (Mooney Dep.) at pp. 13-14.

The 30-minute rule for calls between a patient and his attorney was put in place because the phone had to be shared by other patients, there was limited time available due to all of the other activities in which patients were required to participate, and because generally 30 minutes was sufficient (with additional time being made available upon request).  Oberg Aff., Ex. 17 (Mooney Dep.) at p. 11.

DeLaney testified that in one instance, while he was living at the Annex in 2007, he was denied a request to place a call to his attorney on the basis that there was not enough staff available to assist him and he was not able to place the call until three weeks later.  Oberg Aff., Ex.8 (DeLaney Dep.) at p. 24.

Beaulieu asserted that he has been denied unmonitored calls with opposing counsel.  See O'Neill Aff., Ex. 2 (Beaulieu Decl.), ¶ 3.  Further, Beaulieu testified that on one occasion he was not allowed to speak with his counsel on the present case for more than the allotted 30 minutes because staff was not available to assist him with an extended call.  See Oberg Aff., Ex. 5 (Beaulieu Dep.) at p. 58.  Beaulieu was told that if he wanted more time to speak with his attorney, he needed to make a request.  Id. Beaulieu also stated that when he has made a request for additional time, he has on occasion been given additional time on the same or the next day.  Id. at p. 59.

On June 28, 2010, Beaulieu's Individualized Program Plan Method ("IPP"), restricted him to two staff-assisted attorney calls per week including calls where he was only allowed to leave a message.  This plan was put into place because Beaulieu asked for assistance with his legal calls in "an intense and excessive fashion."  See O'Neill Aff., Ex. 69 ("June 18, 2010 IPP").  Specifically, the IPP provided that Beaulieu had

been assisted by five different staff with more than 50 calls over a two-and-a-half-month period of time, which resulted in more than five calls per week.  Id.  The IPP also provided that Beaulieu made numerous amounts of requests to speak to the same attorneys and had become belligerent when he believed that his calls were not placed in a timely manner.  Id.

On August 3, 2010, a second IPP was issued, which allowed Beaulieu up to five staff-assisted attorney calls per week (including calls where he was only allowed to leave a message).  Id., Ex. 70 (August 3, 2010 IPP).  The IPP also provided that each call could only last for up to 30 minutes and that if he needed more time, he had to make a prior request pursuant to the telephone policy.  Id.

While civilly committed individuals have a First Amendment right to telephone access, involuntary confinement may require restrictions on the right to free speech. See Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 130 (1977). see also Young v. Seling, No. 01-35697, 72 Fed. Appx. 657, 2003 WL 21920006 at *2 (9th Cir. Aug. 11, 2003) (quoting Keenan v. Hall, 83 F.3d 1083, 1092 (9th Cir.1996), citing Strandberg v. City of Helena, 791 F.2d 744, 747 (9th Cir. 1986)) (finding that civilly committed individuals "'have a First Amendment right to telephone access, subject to reasonable security limitations.'"); Benzel v. Grammer, 869 F.2d 1105, 1108 (8th Cir. 1989) ("Although in some instances prison inmates may have a right to use the telephone for communication with relatives and friends, prison officials may restrict that right in a reasonable manner, 'subject to rational limitations in the face of legitimate security interest of the penal institution.'") (quoting Hutchings v. Corum, 501 F. Supp. 1276, 1296 (W.D. Mo. 1980)).

The test enunciated in <u>Turner v. Safley</u>, 482 U.S. 78 (1987) is appropriate for determining whether the restrictions placed on plaintiffs' telephone use were reasonable for First Amendment purposes.  <u>See Semler</u>, 2010 WL 145275 at *16 (applying the <u>Turner</u> factors to a motion to dismiss, court found that the fees and restrictions involving MSOP's telephone system did not violate Plaintiffs' First Amendment rights).   In determining whether a prohibition on a constitutional right is reasonable under <u>Turner</u>, a court is to consider four factors: (1) whether prohibiting an inmate from exercising a constitutional right is rationally related to a legitimate governmental interest; (2) whether there are alternative means of exercising the right; (3) what effect accommodation of the interest would have on guards, other inmates, and the allocation of prison resources; and (4) whether there are ready alternatives by which the prison could continue to serve its interest without impinging on constitutional rights. <u>See Turner</u>, 482 U.S. at 89-90.

Applying the <u>Turner</u> factors, this Court finds that the MSOP's policy prohibiting direct incoming calls,[19] monitoring non-legal calls and to restricting the length of outgoing legal calls to 15 minutes, does not violate the First Amendment.   First, restricting incoming calls, monitoring outgoing non-legal calls and restricting the length of calls is rationally related to a legitimate governmental interest of institutional security and limited resources.   Mooney testified that the reason for deciding to monitor patient calls was that MSOP staff had learned that recent escapes from the St. Peter facility had been facilitated with outside support over the telephone.  <u>See</u> Oberg Aff., Ex. 17 (Mooney Dep.) at p. 8.   Further, since the implementation of the monitored telephone

---

[19]     This Court notes that while patients were not allowed incoming calls, patients had access to a voice mail system in which individuals outside of the facility could leave them messages, subject to the messages being recorded and monitored.  <u>See</u> O'Neill Aff., Ex. 58 (MSOP 302.020, effective 10/6/09); Ex. 59 MSOP Policy 302.020, effective 2/3/09); Ex. 60 (MSOP Policy 302.020, effective 11/20/08).

system, staff have discovered numerous sexual calls by a patient to a female vulnerable adult; calls by a patient to a female on the outside who was planning to smuggle hacksaw blades into the facility; calls made for the purpose of smuggling narcotics into the facility to sell to other patients; and a call made by a patient who was grooming a seventeen-year-old girl and was trying to convince her to send revealing photographs of herself to him.  See Windels Aff., Ex. W-6 (Affidavit of Dennis Smith), ¶ 35.  In fact, the monitored telephone conversations between Beaulieu and a staff member revealed that they had formed an inappropriate relationship, which caused the staff member to resign. Id., Ex. W-2 (Affidavit of Ralph Schmidt), ¶ 13.  Later-monitored calls also revealed that Beaulieu and the former staff member were planning to smuggle drugs into the facility by concealing the drugs in a hollowed out pair of sandals that were to be sent as a package to Beaulieu.  Id., ¶ 14.

With regards to limiting the length of phone calls, the rationale articulated in support of this limitation was that the phones had to be shared with other patients.  See Oberg Aff., Ex. 17 (Mooney Dep.) at p. 11.  In light of limited staff resources, this interest is reasonable related to a legitimate governmental interest of providing phone access to all patients

Second, plaintiffs have alternatives through which they may exercise their First Amendment rights--they are allowed to have visitors and send or receive mail.  See Windels Aff., Ex. W-6 (Affidavit of Dennis Smith), ¶¶ 33, 38.

Third, allowing unmonitored calls or unlimited time on the phone affects both the security of other patients and staff, as well as the opportunities for all patients to make calls due to the monopolization of the telephone by a few patients.

As to the fourth Turner factor, the Court does not find that reasonable alternatives are available to the MSOP to meet the competing interests of the Program, staff and patients.  Plaintiffs pointed to their expert's report, which stated that a New Jersey facility allows patients to receive calls, see Pls.' DHS Opp. at p. 52 (citing O'Neill Aff., Ex. 42 (Berlin Report) at p. 7)), but this opinion gives this Court no guidance where no description was provided as to how that facility allowed incoming calls, and at the same time, addressed the legitimate concerns articulated by the DHS Defendants. Instead, the unrebutted evidence before the Court is that the patients had abused the use of telephones before the present telephone policy was put in place, including grooming victims and taking advantage of vulnerable adults.  See Windels Aff., Ex. W-6 (Affidavit of Dennis Smith), ¶¶ 19-23.

In summary, applying the evidence presented by the parties to the four Turner factors, this Court finds that the MSOP's telephone policy does not violate plaintiffs' First Amendment rights.  See, e.g., Semler, 2010 WL 145275 at *16 (finding, pursuant to analysis under Turner, that the MSOP's telephone policy of monitoring telephone calls and prohibiting incoming calls did not violate the patients' rights, as the telephone restrictions were imposed in response to patients' telephone use that violated MSOP rules, or violated the law).

Turning to plaintiffs' claims that the phone policy unlawfully interfered with their right to communicate with counsel, the DHS Defendants maintained that they provide patients with free, unmonitored calls to their attorneys, but because they are operating a secured treatment facility, they cannot provide patients with unfettered and on-demand telephone access to attorneys.  See Defs.' Mem. at pp. 47-48.  The DHS Defendants focused on plaintiffs' admissions that they have been able call their attorneys, even

though calls are made within a range of time, and no plaintiff has asserted an injury based on any delay.  Id. at p. 48.  The DHS Defendants further took issue with assertion that patients should be allowed to make privileged calls to opposing counsel when plaintiffs cannot assert any privilege, which would govern the content of those communications.  Id.

The Court finds that the MSOP telephone policy, as it applies to privileged communications, is rationally related to the legitimate penological interests of security and conserving limited staff resources.  Verifying that calls are being made to an attorney, as opposed to other unauthorized individuals, implicates facility security. Similarly, monitoring voicemails, including those from attorneys, also affects facility security, as there is no way to distinguish between calls from attorneys and calls from other individuals.

While plaintiffs provided evidence that they have experienced delays in getting a privileged call set up and that on occasion their calls were terminated before they had finished speaking with their attorney, they have neither asserted nor presented evidence that they have been completely precluded from contacting their attorneys by telephone or that they have suffered any prejudice or injury to their legal proceedings due to the delays or terminated calls because of the 30-minute time limit.

For example, Beaulieu testified that on one occasion he needed to speak with his counsel on the present case for more than the allotted 30 minutes, but was not allowed to because staff was not available to assist him the extended call.  See Oberg Aff., Ex. 5 (Beaulieu Dep.) at p. 58.  However, Beaulieu was told that if he wanted more time to speak with his attorney he needed to make a request.  Id.   Nothing prevented Beaulieu from making a request before the call to exceed the 30-minute limit or after the call.

Even he acknowledged that on occasion when he has made a request for additional time, he has been given additional time on the same or next day. <u>See</u> Oberg Aff., Ex. 5 (Beaulieu Dep.) at p. 59.

Moreover, plaintiffs have alternatives through which they may exercise their First Amendment rights to access to their legal counsel. "Although prisoners have a constitutional right of meaningful access to the courts, prisoners do not have a right to any particular means of access, including unlimited telephone calls." <u>Aswegan v. Henry</u>, 981 F.2d 313, 314 (8th Cir. 1992) (citation omitted). "Limited access to telephone calls . . . is not a constitutional violation so long as inmates can communicate with their counsel in writing or in person by visits." <u>Ingalls v. Florio</u>, 968 F. Supp. 193, 203-04 (D.N.J. 1997) (dismissal on summary judgment); <u>see also</u> <u>Cesal v. Bureau of Prisons</u>, No. 04-CV-281-DLB, 2006 WL 2803057 at *6 (E.D. Ky. Sept. 28, 2006) (rejecting claim by prisoner on summary judgment whose legal calls were limited and monitored since "reasonable limitations on the number and length of such phone calls do not establish a constitutional violation where the prisoner has other, perfectly adequate means of communication") (citing <u>Massey v. Wheeler</u>, 221 F.3d 1030, 1036-37 (7th Cir. 2000)); <u>Cf.</u>, <u>Bell</u>, 441 U.S. at 551-52 ("[T]here are alternative means of obtaining reading materials that have not been shown to be burdensome or insufficient. . . . the available alternative means of communication . . . [is] a relevant factor in a case . . . where we are called upon to balance First Amendment rights against legitimate governmental interests.") (citations and marks omitted).

Plaintiffs are not only allowed to have their attorneys visit and to send to or receive mail from their attorney (<u>see</u> Windels Aff., Ex. W-6 (Affidavit of Dennis Smith), ¶¶ 33, 38), but they have not asserted that they have not been able to send and receive

letters from their legal counsel or have contact visits with their attorneys.  As such, to the extent that plaintiffs have experienced delays in making phone calls to their attorneys, nothing prevented them from communicating with their attorneys via these other means.  Any extra delay caused by the use of the mail or a contact visit does not render that mechanism an unreasonable alternative to telephone communications.  See Simpson v. Gallant, 223 F. Supp.2d 286, 296 (D. Me. 2002) ("The extra delay of relying on the mail to contact [one's] attorney . . . does not make this an unreasonable alternative to the phone").

As for the monitored voicemail system, there is nothing prohibiting an attorney from asking a patient to give the attorney a call back on an unmonitored line without divulging any attorney-client communications and the voicemail system warns someone leaving a message that it may be monitored.

Likewise, the fact that Beaulieu had been restricted to two calls to his attorney per week and then five calls per week was not unreasonable, especially given that he had alternative means of communication.  See  Lewis v. Casey, 518 U.S. 343, 389-90 (1996) ("The District Court also struck down regulations that clearly pass muster under Turner [ ] such as . . . the allowance of phone calls only for "legitimate pressing legal issues."); see also Robbins v. South, 595 F. Supp. 785, 789-90 (D. Mont. 1984) ("Plaintiff also contends that his right of legal access is unduly restricted by the following prison policies: the requirement of prior written authorization to telephone counsel; the limitation of telephone calls to weekdays; and the limitation of outside calls to one per week. The court is persuaded that these policies regarding telephone communications do not abridge the inmate's meaningful access to counsel and the courts. These limitations are reasonable measures required to manage the telephone communications

of the general inmate population as a whole. In addition to placing one outside call a week, the plaintiff may also contact his counsel through the mail or during prison visitations."); <u>Pino v. Dalsheim</u>, 558 F. Supp. 673, 674-75 (S.D.N.Y. 1983) (finding that the defendant was not obligated to provide "the best manner of access," and, therefore, there was no constitutional violation where inmate was limited to two, eight-minute phone conversations per month but was allowed unlimited mail correspondence with his attorney and private visits).

Finally, the Court finds that defendants' refusal to allow Beaulieu unmonitored telephone conversations with opposing counsel does not violate any constitutional right, because such conversations with opposing counsel are not privileged.

For all of these reasons, the DHS Defendants' motion for summary judgment should be granted as it relates to plaintiffs' telephone access claim and the claim be dismissed with prejudice.

## I. <u>Double-Bunking, Toilets and Showers</u>

Plaintiffs claimed that policies created by DHS Defendants Considine and Hattenberger, at the direction of DHS Defendants Johnson, Mooney, and Erskine, forced plaintiffs, when living at the Annex, to use communal showers and toilets, and subjected them to double-bunking plaintiffs in cells too small for two patients. <u>See</u> Amended Complaint, ¶ 24. Further, plaintiffs asserted that in Complex 1, plaintiffs are double-bunked in cells that are too small to house two people for an extended period of time and they are forced to use communal showers and toilets with doors that provide little privacy from staff or other patients. <u>Id.</u>, ¶ 33. Plaintiffs claim that these actions by the DHS Defendants violate their due process right to privacy under the Fourteenth Amendment. <u>Id.</u>

Several plaintiffs in this action had roommates while housed at the Annex.  See O'Berg Aff., Ex. 4 (Beaulieu III Dep.) at p. 15; Ex. 5 (Beaulieu Dep.) at p. 67; Ex. 7 (Gimmestad Dep.) at p. 19; Ex. 8 (DeLaney Dep.) at p. 26; Ex. 9 (Yazzie Dep.) at p. 51. The Annex rooms did not have a toilet.  Id.  There was curfew at the Annex, from approximately 9:40-10:00 p.m. until 6:15 a.m. the following morning, but there were no locks on the rooms.  Id., Ex. 11 (Carlson Dep.) at pp. 52-54.

The reason for double-occupancy at the Annex was that the patient population had grown to the point that there was not enough room to allow for single occupancy. See Oberg Aff., Ex. 12 (Considine Dep.) at p. 36; Ex. 13 (Erskine Dep.) at p. 38.  Staff attempted to place people together in the Annex who were compatible.  See Oberg Aff., Ex. 12  (Considine Dep.) at pp. 36-37.

The Annex had communal bathrooms with toilets in enclosed stalls in which no one could see.  See Oberg Aff., Ex. 5 (Beaulieu Dep.) at p. 70; Ex. 9 (Yazzie Dep.) at pp. 53-54.  Staff would check the bathroom if they noticed that a patient had been in it for a long period of time and they made periodic checks of the bathroom, announcing their presence before entering.  Id., Ex. 7 (Gimmestad Dep.) at pp. 21-22; Ex. 12 (Considine Dep.) at pp. 37-38; Ex. 14 (Hattenberger Dep.) at pp. 64-65.

Beaulieu filed a grievance regarding an occurrence where staff approached him while he was in the bathroom stall and made fun of him for taking so long with his bowel movement.  See O'Neill Aff., Exs. 73 (grievance), 74 (grievance review).  Beaulieu testified that at no time has staff ever looked in on him while he was in the bathroom stall.  See Oberg Aff., Ex. 5 (Beaulieu Dep.) at pp. 71-72.

With regards to showers, the Annex contained a communal shower room that contained a number of stalls that were 4 by 4 feet with curtains in the front of them that

were not see-through.  O'Berg Aff., Ex. 5 (Beaulieu Dep.) at pp. 68-70.  The shower room had a door with a window that was covered by a curtain on the outside of the door.  Id. at p. 70.

All cells in Complex 1 are double occupancy rooms and were designed to be used as such.  O'Neill Aff., Ex. 12 (Carlson Dep.) at p. 50-51.  The square footage of these rooms is 80-85 feet.  Id. at p. 51.  The patients are locked in their rooms at night from 9:45 p.m. to 6:15 a.m.  Id. at pp. 52-53.  The rooms also contain toilets, which initially were not enclosed.  Id., Ex. 20 (Linkert Dep.) at p. 53.  Patients were provided with privacy screens that could be placed around the toilet in the second week of September 2009.  Id.; Ex. 17 (Gimmestad Dep.) at p. 20.

In Complex 1, along with the toilets in the patients' rooms, the living units contained a bathroom with a toilet and sink with a door that shuts.  Id. at p. 72-73; Ex. 9 (Yazzie Dep.) at pp. 54-55; O'Neill Aff., Ex. 17 (Gimmestad Dep.) at p. 20.

In Complex 1, the shower stalls initially had doors that covered the torso area.  Oberg Aff., Ex. 8 (DeLaney Dep.) at p. 28.  DeLaney testified that because of the location of the shower, anyone looking down from the floor above in the room could see down into the shower.  Id.  Bush testified that the shorter doors allowed people to tell that patients were in the shower, but that they "probably couldn't see that much" as it related to the genital area.  Id., Ex. 6 (Bush Dep.) at pp. 25-26.  These shower doors were replaced with longer doors.  Id.

According to plaintiffs, the MSOP's requirement that they be double-bunked at the Annex for some portion of time in rooms not intended for two persons, and the continued double-bunking of some of the plaintiffs in Complex 1, violates their due process right to privacy.  See Pls.' DHS Opp. at p. 55.  In particular, plaintiffs asserted

that they are locked in their room at night with their roommates for eight to nine hour periods and that they have no privacy from their roommate.  Id. at p. 56.  In addition, plaintiffs complained that they had no privacy while going to the bathroom during the lockdown period in Complex 1 until staff provided a screen for privacy.  Id. at p. 56. Plaintiffs also argued that their right to privacy was violated because the showers in Complex 1 initially had doors that only covered the torso area, which due to the location of the showers, allowed patients who were on a floor above to see them in the showers. Id.  Beaulieu submitted that his right to privacy was violated when on one occasion a staff member approached him while in the bathroom and asked him why he was taking so long for his bowel movement.  Id. at p. 57.

In their motion for summary judgment, the DHS Defendants argued that double-bunking patients does not amount to an unconstitutional punishment for the purposes of the due process clause and that deference should be provided to the MSOP's need for double-occupancy rooms.  See DHS Mem. at pp. 49-51. The DHS Defendants also asserted that plaintiffs' bathroom and shower privacy claims are insufficient to state a claim for a violation of their right to privacy.  Id. at p. 50.

The Due Process Clause governs a challenge to the conditions of confinement claim for a civilly committed patient, which provides protections that are "at least as extensive" as the Eighth Amendment "rights of the criminally institutionalized." Youngberg, 457 U.S. at 315-17.  Liability is to be imposed for a violation of due process rights where the decision is such a "substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."  Id. at 323.

In the context of double-bunking pretrial detainees in a room meant for single occupancy, the Supreme Court has concluded that there is no "one man, one cell" principle lurking in the Due Process Clause. Bell, 441 U.S. at 542. At the same time, the Supreme Court has acknowledged that "confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause." Id. In analyzing a condition of confinement claim, a court must determine whether the condition complained of constitutes a "'punishment' in violation of the rights of pretrial detainees under the Due Process Clause. . . ." Id. at 560-61. "[T]he determination whether these restrictions and practices constitute punishment in the constitutional sense depends on whether they are rationally related to a legitimate nonpunitive governmental purpose and whether they appear excessive in relation to that purpose." Id. at 561.

In a case subsequent to Bell, the Supreme Court dealt with a challenge under the Eighth and Fourteenth Amendments to a long-term double bunking policy at the Southern Ohio Correctional Facility. See Rhodes v. Chapman, 452 U.S. 337 (1981). The Supreme Court found that "when the conditions of confinement compose the punishment at issue" . . . [those] [c]onditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment." Id. at 347. In reversing the decisions of the district court and the appellate court, the Supreme Court rejected the contention that the lodging of two inmates in a single cell constituted cruel and unusual punishment, concluding that it amounts "[a]t most . . . to a theory that double celling inflicts pain," but not that it constitutes the "unnecessary and wanton infliction of pain." Id. at 346, 348-

49.   Relying on <u>Rhodes</u>, the Eighth Circuit concluded that the double-bunking at issue did not amount to a constitutional violation as it did not evince a "wanton and unnecessary infliction of pain." <u>Cody v. Hillard</u>, 830 F.2d 912, 914 (8th Cir. 1987). "Double-celling could be viewed as cruel and unusual punishment only if it '[led] to deprivations of essential food, medical care, or sanitation' or if it 'increase[d] violence among inmates or create[d] other conditions intolerable for prison confinement.'"   <u>Id.</u> (quoting <u>Rhodes</u>, 452 U.S. at 348).

This Court concludes that the double-bunking at the Annex and at Complex 1 was not punitive in nature and therefore, did not violate the Eighth or Fourteenth Amendments.   Contrary to plaintiffs' assertions, pursuant to <u>Bell</u>, <u>Rhodes</u> and <u>Hillard</u>, there is no <u>per se</u> constitutional violation merely because a patient is double-bunked in a room meant for single occupancy or double-bunked over a long period of time.   In this case, the MSOP had a legitimate reason for double-bunking at the Annex–the patient population had reached such a level that there was not adequate room to allow for single occupancy and at that time, Complex 1 was being built.   <u>See</u> Oberg Aff., Ex. 12 (Considine Dep.) at p. 36; O'Berg Aff., Ex. 13 (Erskine Dep.) at p. 38.   Further, all of the rooms in Complex 1 are double occupancy rooms and were designed to be used as such.   <u>Id.</u>, Ex. 11 (Carlson Dep.) at p. 50-51.

In addition, MSOP staff attempted to place people together that were compatible. <u>See</u> Oberg Aff., Ex. 12 (Considine Dep.) at pp. 36-37.   According to Carlson, a thorough review of each placement by the placement committee is conducted, which includes many members from a wide range of disciplines including security counselors, unit directors and clinical staff.   <u>Id.</u>, Ex. 11 (Carlson Dep.) at pp. 54-55.

Plaintiffs have not presented any evidence that the double-bunking at issue caused or causes any deprivation of essential food, medical care, or sanitation, or that it increased violence among inmates or created other conditions intolerable for prison confinement.

Regarding the toilet situation, in Complex 1, patients were locked in their rooms at night from 9:45 p.m. to 6:15 a.m.  See O'Berg Aff., Ex. 11 (Carlson Dep.) at pp. 52-53.  When Complex 1 first opened in July 2009, the toilets rooms were not enclosed.  Id., Ex. 16 (Linkert Dep.) at pp. 8, 53.  After staff received complaints, in the second week of September 2009, patients were provided with privacy screens that could be placed around the toilet.  Id.; Ex. 7 (Gimmestad Dep.) at p. 20; Ex. 16 (Linkert Dep.) at pp. 53-54.

This Court finds that the initial lack of privacy at night, due to the use of shared toilet by roommates constituted a temporary living arrangement, which does not "'evince the 'wanton and unnecessary infliction of pain' necessary to constitute a violation of the Eighth Amendment.'"  Patchette v. Nix, 952 F.2d 158, 163 (8th Cir. 1991) (quoting Cody, 830 F.2d at 914, quoting Rhodes, 452 U.S. at 348).  The undisputed evidence shows that within two months after patients complained of the privacy issue, the MSOP responded by providing the them with the option of a privacy screen.  As for having to use the toilet in the same room with a roommate, this Court finds that plaintiffs' desire for more personal privacy, especially after being provided with a privacy screen, does not amount to an intolerable constitutional deprivation.  See Aune v. Ludeman, Civil No. 09-0015 (JNE/SRN), 2010 WL 145276 at *6 (D. Minn.  Jan. 08, 2010) (finding on a motion for judgment on the pleadings the fact that the MSOP patient "occasionally must smell 'foul odors' caused by his roommate's use of the toilet or musty towels, or that due

to reasons of personal privacy, he chooses not to use the in-room toilet, or that the common bathrooms are not as clean or modern as he would like, does not rise to the level of a constitutional violation.").

For the same reason, this Court concludes that plaintiffs' claim that they lacked privacy in the shower stalls of Complex 1 to be without merit.  In Complex 1, the shower stalls initially had doors that only covered the torso area, allowing anyone looking down from the floor above to see into shower.  Oberg Aff., Ex. 8 (DeLaney Dep.) at p. 28. These shower doors were then replaced with longer doors that prevented people from seeing the person in the shower.  Ex. 6 (Bush Dep.) at p. 19.

"While the circumstances of institutional life demand that privacy be limited, it is clearly established that gratuitous invasions of privacy violate the Fourteenth Amendment." Hydrick v. Hunter, 500 F.3d 978, 1000 (9th Cir. 2007) (vacated on other grounds by Hunter v. Hydrick, --- U.S. ----, 129 S.Ct. 2431, 174 L.Ed.2d 226 (2009); see also Sanders v. Kingston, 53 Fed. Appx. 781, 784 (7th Cir. 2002) (upholding the dismissal of a privacy claim on a motion to dismiss "[b]ecause the need to watch prisoners closely is a legitimate institutional concern, a prisoner is entitled to little if any privacy, even when using the bathroom or taking a shower."); Spencer v. Bender, Civil Action No. 08-11528-RGS, 2010 WL 1740957 at *3 (D. Mass. April 28, 2010) (dismissing a privacy claim on a motion to dismiss finding that an "[a]n inmate's lack of privacy while using the toilet or shower also does not violate the Eighth or Fourth amendments.").  This Court finds that shower doors covering the torso area, and their subsequent replacement with longer doors, is neither a gratuitous invasion of privacy nor a due process violation.

The Court also finds no cognizable privacy claim on behalf of Beaulieu because a staff member teased him about taking too long in the bathroom.  See O'Neill Aff., Exs. 73 (grievance), 74 (grievance review).  Beaulieu testified that at no time has staff ever looked in on him while he was in the bathroom stall.  See Oberg Aff., Ex. 5 (Beaulieu Dep.) at pp. 71-72.  Policy required staff to check the bathroom when they noticed that a patient had been in the bathroom for a long period of time and to make periodic checks of the bathroom, announcing their presence before entering.  See Oberg Aff., Ex. 12 (Considine Dep.) at pp. 37-38; Ex. 14 (Hattenberger Dep.) at pp. 64-65; O'Neill Aff., Ex. 17 (Gimmestad Dep.) at pp. 21-22.  Making fun of Beaulieu for taking too long in the bathroom, without more, did not amount to a gratuitous invasion of his bodily privacy so as to warrant the finding of a constitutional violation.

For all the reasons, the DHS Defendants' motion for summary judgment should be granted as it relates to plaintiffs' privacy claims and the claims be dismissed with prejudice.

**J.** **Sanitation Claims**

Plaintiffs claimed that defendants failed to provide plaintiffs with adequate conditions of confinement and have exposed them to potentially severe health risks. See Amended Complaint, ¶ 26.  In particular, plaintiffs complained that the communal showers and bathrooms are only cleaned once a day and that urine and fecal matter are frequently found on the bathroom floor or toilet seats; no sanitizer is readily available to disinfect the floors and toilet seats; dining room tables are not adequately sanitized prior to the services of each meal; the mops and brooms used to clean the bathrooms and showers are also used to clean cells, causing the spread of germs to their cells; and the towels, blankets and cleaning rags are washed in one unit washer

and the water does not reach a temperature needed to properly sanitize them. Id. According to plaintiffs, these concerns have been repeatedly brought to the attention of Program staff, but are ignored. Id. Plaintiffs claim the actions of the Program's staff constitutes deliberate indifference, and that civilly committed patients have a right under the Fourteenth Amendment not to be exposed to unsanitary conditions. Id.

In the Annex, bathrooms were cleaned one to two times per day, or as needed. See Oberg Aff., Ex. 16 (Linkert Dep.) at p. 56. Hattenberger testified that the patients would clean the bathroom twice a day, which included mopping and sanitizing all the surfaces. Id., Ex. 14 (Hattenberger Dep.) at p. 67. Patients, as part of a work-for-pay job, were responsible for cleaning the communal bathrooms. Id., Ex. 9 (Yazzie Dep.) at p. 59;[20] Ex. 14 (Hattenberger Dep.) at p. 67; Ex. 16 (Linkert Dep.) at p. 56. Some of the patients who were responsible for cleaning failed to do so. Id., Ex. 8 (DeLaney Dep.) at p. 29.

There were cleaning supplies available to patients to the extent they wanted to clean any part of the bathroom. See Oberg Aff., Ex. 14 (Hattenberger Dep.) at p. 67; see also Ex. 8 (DeLaney Dep.) at pp. 29-30; Ex. 9 (Yazzie Dep.) at p. 60. If the mess was a "horrendous mess," the clean-up job would be offered to patients as overtime pay. See Oberg Aff., Ex. 14 (Hattenberger Dep.) at p. 67.

There were instances at the Annex where a patient intentionally urinated or left feces on the ground; the response would be to have the patient who made the mess clean it up, have work-for-pay patients clean up the mess with staff supervision, or have the general staff clean it, if no paid patients were available. Id., Ex. 12 (Considine Dep.)

---

[20]     Yazzie testified that when he first arrived at the Annex, the bathrooms were only cleaned once a day, however, after complaints, the bathrooms were cleaned twice a day. See O'Berg Aff., Ex. 9 (Yazzie Dep.) at pp. 59-60.

at pp. 38-39; Ex. 13 (Erskine Dep.) at p. 41; Ex. 16 (Linkert Dep.) at p. 57; Ex. 17 (Mooney Dep.) at pp. 55-56. The affected area would be off limits until the mess was cleaned. Id., Ex. 13 (Erskine Dep.) at p. 41.

Beaulieu testified that there were times when he reported to staff that there was a mess in the bathroom, which staff cleaned; however, there were other times when staff chose to wait until it was time for the paid patients to clean the bathroom in order to resolve the mess. See O'Neill Aff., Ex. 9 (Beaulieu Dep.) at p. 84. Beaulieu also testified that he once witnessed a patient clean up urine in the bathroom with a mop and then proceed to use the same mop to clean the rest of the bathroom. Id.

Patients did not receive training for their cleaning job, but received a sheet outlining their duties, including on how to deal with biohazards. See O'Berg Aff., Ex. 5 (Beaulieu Dep.) at pp. 88-89. Beaulieu knew that if a mop was used to clean a biohazard, the mop was to be placed in a biohazard bag to be cleaned and then the affected area was to be sanitized with another chemical. Id. at p. 89; Ex. 17 (Gimmestad Dep.) at pp. 27-28. Bush also testified that the mop used to clean biohazards was supposed to be washed before reuse. Id., Ex. 6 (Bush Dep.) at p. 23. DeLaney noted that all sorts of chemicals were used in the rags to clean the facilities. Id., Ex. 8 (DeLaney Dep.) at pp. 30-31. Yazzie testified that there were patients who simply rinsed used mops when new mops were not available, but that he had never witnessed a patient doing so. Id., Ex. 9 (Yazzie Dep.) at pp. 61-62.

Bush testified that if someone soiled the showers, patients could not go into the bathroom until it was cleaned up. Oberg Aff., Ex. 6 (Bush Dep.) at p. 24. Bush stated that in those instances, he would go and use the shower facilities in the west part of the facility. Id. Bush also stated that sometimes the clean-up would be slow and they

would wait for another patient to clean the mess or eventually staff would clean it.  Id. at pp. 22, 25.

There is no MSOP record of any patients becoming sick due to bodily wastes in the toilets or the showers.  See Oberg Aff., Ex.12 (Considine Dep.) at p. 40; Ex. 14 (Hattenberger Dep.) at p. 68.  Beaulieu stated in his declaration that he contracted Norovirus while housed in the BTU.  See O'Neill Aff., Ex. 1 (Beaulieu Decl.).  There was no mention made as to how the virus was spread.

With regards to the laundry, patients did their own laundry at the Annex.  See Oberg Aff., Ex. 16 (Linkert Dep.) at p. 58.  A linen service that was used by hospitals, was also used every week at the Annex and Complex 1, so that patients could exchange their linens and have the linens cleaned.  Id., Ex. 16 (Linkert Dep.) at pp. 58-60.  If a patient received a stained linen, they could exchange it for a new linen.  Id., Ex. 16 (Linkert Dep.) at p. 60.

Plaintiffs testified that their laundry facilities did not use sufficiently hot water, but they did not know the temperature of the water the MSOP used.  See O'Berg Aff., Ex. 5 (Beaulieu Dep.) at p. 85; Ex. 6 (Bush Dep.) at p. 22; Ex. 7 (Gimmestad Dep.) at p. 27; Ex. 9 (Yazzie Dep.) at p. 60.  DeLaney testified that he was told that the temperature used to wash the clothes was 200 degrees.  See O'Berg Aff., Ex. 8 (DeLaney Dep.) at p. 30.

As for the dining tables, there was cleaning equipment available to patients to clean the tables if they so desired.  O'Berg Aff., Ex. 5 (Beaulieu Dep.) at p. 91; Ex. 6 (Bush Dep.) at p. 23.  Bush testified that the tables were sanitized after every meal.  Id., Ex. 6 (Bush Dep.) at p. 23. Gimmestad stated that it was his duty, as part of the kitchen

crew, to sanitize the tables before and after every meal.  <u>Id.</u>, Ex. 7 (Gimmestad Dep.) at p. 28; <u>see</u> <u>also</u> Ex. 9 (Yazzie Dep.) at p. 61.

The DHS Defendants asserted that the unsanitary conditions alleged by plaintiffs do not amount to a due process violation because the bathrooms and showers at the Annex were regularly cleaned, plaintiffs had access to cleaning supplies, and plaintiffs' assertion that their laundry was not adequately sanitized was based on speculation. <u>See</u> DHS Mem. at p. 53.  Plaintiffs disputed these contentions, arguing that there is a fact dispute as to how fast messes were cleaned, the evidence showed that dirty rags were used to clean the Annex, plaintiffs were exposed to unsanitary conditions for weeks and that the DHS Defendants were aware of these conditions.  <u>See</u> Pls.' DHS Opp. at pp. 58-59.

Civilly committed individuals retain a fundamental interest in their safety and personal security, under the Due Process Clause, but not an absolute right.  <u>See</u> <u>Youngberg</u>, 457 U.S. at 319-20.  This interest includes a clearly established right to not be exposed to unsanitary conditions. <u>See</u> <u>Youngberg</u>, 457 U.S. at 315-16 (citations omitted); <u>Hydrick</u>, 500 F.3d at 997 (citation omitted).  Certainly, plaintiffs are entitled to "reasonably adequate sanitation, personal hygiene, and laundry privileges, particularly over a lengthy course of time." <u>Howard v. Adkison</u>, 887 F.2d 134, 137 (8th Cir. 1989) (citation omitted).  As stated previously, because under the Fourteenth Amendment, civilly committed detainees "are entitled to 'at least as great' protection as that afforded convicted prisoners under the Eighth Amendment,' we apply the identical deliberate-indifference standard as that applied to conditions-of-confinement claims made by convicts." <u>Crow v. Montgomery</u>, 403 F.3d 598, 601-02 (8th Cir. 2005) (pertaining to pretrial detainees) (quoting <u>Owens v. Scott County Jail</u>, 328 F.3d 1026, 1027 (8th Cir.

2003), quoting <u>City of Revere v. Mass. Gen. Hosp.</u>, 463 U.S. 239, 244 (1983)).

Therefore, plaintiffs "must show, (1) objectively, that the conditions of [their] confinement 'posed a substantial risk of serious harm' and, (2) subjectively, that the defendants 'actually knew of but disregarded, or were deliberately indifferent to, [plaintiffs] health or safety.'"  <u>Grayson v. Ross</u>, 454 F.3d 802, 808 (8th Cir. 2006) (quoting <u>Crow</u>, 403 F.3d at 602).

There are several cases from the Eighth Circuit that are instructive regarding the level of sanitation required by the Constitution.  In <u>Smith v. Copeland</u>, the Eighth Circuit found that the defendants were entitled to summary judgment where the plaintiff had been subjected to an "overflowed toilet in his cell for four days."  87 F.3d 265, 269 (8th Cir. 1996).   In reaching this conclusion, the court explained that not every "overflowed toilet in a prison amounts to a constitutional violation." <u>Id.</u> at 268.   At the same time, the court noted constitutional violations had been found where inmates were forced to work without protective gear "in a shower of human excrement;" and where an inmate was forced to endure a cell covered with filth and human waste for two full years. <u>Id.</u> at 269 (citations omitted).   According to the Eighth Circuit, "the length of time a prisoner is subjected to harsh conditions is a critical factor in our analysis" and while conditions such as a filthy cell may be tolerable for a few days, they may be intolerably cruel for weeks or months. <u>Id.</u> (citations omitted).

In <u>Goldman v. Forbus</u>, following an evidentiary hearing, the district court found that an arrestee who had spent two nights in a two-man cell with two other men, and then in an eight-man cell with ten other men, slept on a mattress on the floor, and due to the size of the cell, was forced to position his mattress near the toilet so that urine was sprinkled on him when his cellmates used the toilet for two nights, did not suffer an

unconstitutional punishment. 17 Fed. Appx. 487, 2001 WL 838997 at *1 (8th Cir. July 26, 2001) (unpublished per curiam). Relying on Smith, the Eighth Circuit affirmed the decision, observing that "[p]laintiff's stay in each cell was brief, he was allowed to leave the cells during the day, the record does not show that he suffered any physical harm from being housed in either cell, and when he complained about not having a bed, he was moved to a cell where he had one." Id.

In White v. Nix, the plaintiff contended the conditions he endured while in his cell were so unsanitary as to amount to cruel and unusual punishment in violation of his Eighth Amendment rights.  7 F.3d 120, 121 (8th Cir. 1993).  The Eighth Circuit concluded that the evidence showed that the conditions of the plaintiff's confinement did not constitute cruel and unusual punishment so as to deprive the plaintiff of his Eighth Amendment rights, where there was no evidence that the cell was covered with a mixture of dried human fecal matter and food as plaintiff contended and he was provided with cleaning materials in order to correct the alleged unsanitary conditions. Id.  Accordingly, the Eight Circuit determined that the plaintiff was unable to show that he was deprived of the "minimal civilized measure of life's necessities." Id.

In Whitnack v. Douglas County, the plaintiffs, who were pretrial detainees, were transferred to a new cell that had a toilet covered with dried feces on both the inside and outside, dried puddles of urine on the floor, a sink covered with hair and vomit, a floor covered with garbage and rotting food, and walls covered with dried human mucus. 16 F.3d 954, 956 (8th Cir. 1994).  The plaintiffs complained, but the correctional officer refused to move them to a different cell and also refused to give them cleaning supplies. Id.  A different correctional officer gave the plaintiffs some limited cleaning supplies about three or four hours later, and the next day the plaintiffs received additional

cleaning supplies, consisting of a broom, a dust pan, a sponge, a mop, a toilet bowl brush with a concentrated white chemical for toilets, and a spray cleaner.  Id.

The correctional officer argued that the cell was not so filthy, and that the plaintiffs' exposure to the cell was not so long as to amount to a constitutional violation. Id. at 957.  The Eighth Circuit agreed, reversing a jury verdict finding for the plaintiff, stating:

> The outcome of this case is largely dependent on the very short period of time during which the plaintiffs were confined in Cell C-18 before they were given full and adequate cleaning supplies. "Conditions, such as a filthy cell, may 'be tolerable for a few days and intolerably cruel for weeks or months.'" Howard, 887 F.2d at 137 (quoting Hutto v. Finney, 437 U.S. 678, 687, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978)).  Here, the intolerable conditions lasted not more than 24 hours before the availability of adequate cleaning supplies would make them tolerable. We recently reasoned that a prisoner confined to an allegedly unsanitary cell for eleven days could not prove an Eighth Amendment violation because of the "relative brevity" of his stay, White, 7 F.3d at 121, particularly when cleaning supplies were available to him. Other courts have likewise found that certain conditions are not cruel and unusual because the inmate was subjected to the condition for only a short period of time. See, e.g., Miller v. Glanz, 948 F.2d 1562, 1569-70 (10th Cir. 1991) (plaintiff experienced only "momentary discomfort" when he was handcuffed in "awkward position" for two hours); Harris v. Fleming, 839 F.2d 1232, 1235-36 (7th Cir. 1988) (plaintiff "experienced considerable unpleasantness" for five days due to "filthy, roach-infested cell"). Where we have recognized constitutional violations with short periods of time, we have done so because the plaintiffs were deprived of an identifiable human need immediately upon being subjected to the inhumane condition. See Gordon v. Faber, 973 F.2d 686, 687-88 (8th Cir. 1992) (holding that plaintiffs were subjected to cruel and unusual punishment when they were forced to stand outside in winter weather without proper clothing for about two hours).
>
> While we have no doubt that reasonably adequate sanitation and the ability to eliminate and dispose of one's bodily wastes without unreasonably risking contamination are basic identifiable human needs of a prisoner protected by the

Eighth Amendment, this record contains no showing that either of the plaintiff's attempts to meet his body's needs were interfered with before cleaning supplies were provided to them. Neither does the record show that they made any requests to use alternative toilet facilities which were refused. There is no claim that the cell's plumbing did not work nor that the accumulated waste and garbage in the toilet rendered it inoperable if flushed. Within three or four hours they had been furnished with a spray cleaner (which one of them described as being like "409") which could have been used to clean the toilet seat and sink bowl.

Prisoners in the DCCC are expected to clean their own cells, and to maintain them in a reasonably clean condition. Arellano testified that he initially refused to enter the cell because of its conditions (Tr. at 117), and Whitnack testified that he was "mad" about the conditions (id. at 212). We have no doubt that the unsanitary conditions of Cell C-18 were patently offensive to see and to smell, but the plaintiffs cannot carry their burden of proof simply by putting on evidence that they were offended by, or made uncomfortable by, the generally unclean and decidedly unpleasant overall conditions of the cell.

Notwithstanding our conclusion, we must take this opportunity to say that we find the conditions of Cell C-18 on September 28, 1989, to have been deplorable. We can easily conclude that such conditions could cause actionable harm if a prisoner were exposed to them for a much longer period of time. While the length of time a prisoner must endure an unsanitary cell is undoubtedly one factor in the constitutional calculus, the degree of filth endured is surely another, and in our view, the length of time required before a constitutional violation is made out decreases as the level of filthiness endured increases. We decide this case as we do simply because we cannot find a constitutional violation where the record fails to show that the conditions were of any proven adverse consequence to the health or other basic human needs of the plaintiffs, given the brevity of their confinement.

Id. at 958.

Plaintiffs raised numerous sanitation issues that they assert allow them to survive summary judgment. The Court finds otherwise. First and foremost, accepting plaintiffs'

version of the facts, none of the incidents described by plaintiffs are of sufficient duration to support a claim of deliberate indifference to their personal needs.

Second, the specific incidents described by plaintiffs either lacked proof on how long they lasted, or relied on inadmissible evidence to support the substance of the claim.

For example, plaintiffs pointed to the fact that the bathroom floors are frequently soiled with feces and urinated upon, in many instances intentionally by patients, and that a dispute of fact exists as to how quickly these messes were cleaned.  <u>See</u> Pls.' DHS Opp. at p. 58.  But at the same time, plaintiffs failed to provide evidence as to the length of time they were exposed to these conditions in the bathroom, and there is no dispute that the bathrooms were cleaned at least daily (<u>see</u> O'Berg Aff., Ex. 9 (Yazzie Dep.) at pp. 59-60: Ex. 16 (Linkert Dep.) at p. 56).  Based on this record, this Court concludes that the exposure would not have exceeded 24 hours, which is clearly too short of time to make out a due process violation.

Further, while it is uncontested that the bathrooms did get dirty, the undisputed evidence demonstrates that there were cleaning supplies available to patients to the extent they wanted to clean any part of the bathroom.  <u>See</u> Oberg Aff., Ex. 8 (DeLaney Dep.) at pp. 29-30; Ex. 9 (Yazzie Dep.) at p. 60; Ex. 14 (Hattenberger Dep.) at p. 67; Ex. 16 (Linkert Dep.) at p. 56.  Additionally, if someone soiled the showers, or patients could not go into the bathroom until it was cleaned up, they could go and use the facilities in another part of the Annex.  <u>See</u> O'Berg Aff., Ex. 6 (Bush Dep.) at p. 24.

Given the short amount of time of the exposures, the ability of patients to clean up the mess if they so desired, and the availability of alternative facilities when there was a mess, this Court finds that these conditions do not amount to cruel and unusual

punishment, or deliberate indifference so as to create an actionable claim under the Fourteenth Amendment.

Plaintiffs also identified an instance where staff did not clean up feces in the dining area prior to the feeding of the patients. See Pls.' DHS Opp. at pp. 58-59. On January 19, 2009, Beaulieu sent a Patient Request Form asking staff to address the issue of feces being dropped in the dining area during mealtime and not being cleaned away before the meal. See O'Neill Aff., Ex. 75. The response by MSOP staff was "staff members picked up and washed areas when staff available to do so." Id. No evidence presented as to how long patients were exposed to the feces or where the feces was located. In addition, no evidence was presented that patients were required to eat with feces on the dining table or that patients could not avoid the feces. Further, Beaulieu testified that there was cleaning equipment available to patients to clean the dining area, if they so desired. O'Berg Aff., Ex. 5 (Beaulieu Dep.) at p. 91; see also Ex. 6 (Bush Dep.) at p. 23. In sum, plaintiffs have failed to provide sufficient evidence to demonstrate the presence of feces on one occasion, somewhere in the dining hall, amounted to a constitutional violation, especially where plaintiffs were provided with cleaning supplies to address the situation

Another contention by plaintiffs was that sometimes dirty rags or mops that had been used to clean up messes would be used again in another part of the facility, without being replaced or sanitized, or that when these rags and mops were sent to be washed, they were not properly treated as a biohazard. See Pls.' DHS Opp. at p. 59 (citing testimony from Beaulieu, Yazzie and DeLaney). As an initial matter, the testimony relied upon by plaintiffs from DeLaney did not indicate that mops were not properly bagged as biohazard after their use; rather his testimony was that the Annex

provided biohazard bags only after he complained about their absence.  See O'Berg Aff., Ex. 8 (DeLaney Dep.) at p. 31.

With regards to the reuse of the mops, Beaulieu testified that on one occasion he observed another patient clean urine with a mop and then proceed to clean the rest of the bathroom with the same mop, which resulted in an argument between Beaulieu and the other patient.  O'Berg, Ex. 5 (Beaulieu Dep.) at p. 87.  When staff responded to the argument, Beaulieu claimed that staff told him to act appropriately and he was not certain as to whether the bathroom was re-cleaned.  Id. at pp. 87-88.  Yazzie testified that some patients reused dirty mops without having them washed.  Id., Ex. 23 (Yazzie Dep.) at p. 61.  Yazzie further testified that he did not know if staff had observed this conduct, but that he had knowledge of complaints being made.  Id.  Plaintiffs pointed to no evidence of such complaints, let alone any evidence that the named defendants had knowledge of these complaints.  Based on this record, the Court cannot find that plaintiffs were exposed to unsanitary conditions by any of the DHS Defendants.

Finally, plaintiffs asserted that temperature used to clean laundry was not sufficiently hot to kill bacteria or viruses.  See Pls.' DHS Opp. at p. 59.  Plaintiffs testified that their laundry facilities did not use hot enough water, but they did not know the temperature of the water the MSOP used.  See O'Berg Aff., Ex. 5 (Beaulieu Dep.) at p. 85; Ex. 6 (Bush Dep.) at p. 22; Ex. 7 (Gimmestad Dep.) at p. 27; Ex. 9 (Yazzie Dep.) at p. 60.  DeLaney, relying on inadmissible hearsay, testified that he was told that the temperature used to wash the clothes was 200 degrees.  See O'Berg Aff., Ex. 8 (DeLaney Dep.) at p. 30.  Given that plaintiffs did not know the temperature of the

laundry water, and they are not experts on the temperature needed to kill bacteria and viruses, this Court finds that summary judgment is appropriate on this claim.[21]

In summary, this Court finds that the various incidents of unsanitary conditions presented by plaintiffs were either not supported by admissible evidence or were of such a short duration that they did not give rise to a due process violation.  For all the reasons, the DHS Defendants' motion for summary judgment should be granted as it relates to plaintiffs' sanitation claims and that the claims be dismissed with prejudice.

### K.   <u>Access to Legal Computers</u>

Plaintiffs claimed that the DHS Defendants denied Beaulieu daily access to the legal computer while he is residing in the BTU.  <u>See</u> Amended Complaint, ¶ 34. Because he is housed in the BTU, Beaulieu alleged his status is similar to that in "Administrative Segregation" in a prison setting.  <u>Id.</u>  Beaulieu claims he has a state-created liberty interest in a certain level of access to facilities and that he was denied a procedural due process hearing under the Due Process Clause of the Fourteenth Amendment before being refused access to services afforded to other civilly committed detainees, including the legal computer.  <u>Id.</u>

The MSOP provided patients with access to legal computers that allowed them to do legal research or to create legal documents.  <u>See</u> Oberg Aff., Ex. 17 (Mooney Dep.) at p. 57.  Patients had access to legal computers, provided they signed up for their use pursuant to procedure, and taking into account the need for fair use among patients. <u>Id.</u>, Ex. 11 (Carlson Dep.) at p. 56; Ex. 13 (Erskine Dep.) at p. 42; Ex. 17 (Mooney Dep.) at p. 57.

---

[21]   The DHS Defendants indicated that the Annex used a linen service used by hospitals on a weekly basis so that patients could exchange their linens and have the linens cleaned.  <u>See</u> Oberg Aff., Ex. 16 (Linkert Dep.) at pp. 58-60.

A patient's access to legal computers was not limited based on being placed on any administrative segregation.  See Oberg Aff., Ex. 16 (Linkert Dep.) at p. 36.  There was no restriction on a patient's access to legal computers, unless the patient was out of behavioral control.  Id.., Ex. 11 (Carlson Dep.) at p. 57; Ex. 16 (Linkert Dep.) at p. 36.  MSOP staff was instructed not to limit the access of legal computer to patients in protective isolation, unless they were out of behavioral control.  Id., Ex. 16 (Linkert Dep.) at pp. 37-38.

In the BTU, a legal computer is set up in the team room each night from 6 to 8 p.m. for patients to use in half-hour increments.  Id., Ex. 18 (Ninneman Dep.) at pp. 30, 46.  Patients were allowed to use the legal computer, even if they were on some type of restriction, except in situations where the patients were not under behavioral control.  Id. at p. 33.  If more time was needed, a request for more time could be made.  Id. at p. 46.  Ninneman noted that he tried to get a response back to a patient for a request regarding access to the computer, no later than five days after the initial request.  Id. at p. 48.

Beaulieu testified that the BTU made legal computers available twice a week for 45-minute periods of time.  O'Berg Aff., Ex. 5 (Beaulieu Dep.) at pp. 79-80.  At first, patients were required to go "off-unit" to have access to a computer for one-and-a-half-hour periods, twice a week, and if a patient had any restrictions, they were not allowed to go off site.  O'Neill Aff., Ex. 1 (Beaulieu Decl.), ¶ 34.  The access to legal computers changed to having access on site at the BTU every night for half-hour block, and the allowance of an additional half-hour, if slots were available.  Id.

Beaulieu stated that while he was in the BTU, he was not able to conduct as thorough research as he would have liked because he was not given enough time to do the research before the court of appeals deadline.  See O'Berg Aff., Ex. 5 (Beaulieu

Dep.) at p. 97.  He asked for additional research time and was told by Ninneman that a 4:30-5:30 time period, as well as the 6:00-8:00 p.m. time slot, was available, but that he did not take the 4:30 to 5:30 time slot because dinner started at 5:00 p.m.  Id. at pp. 98-99.  Beaulieu did not make a request to the Minnesota Court of Appeals for extra time to submit his papers because he made the deadline.  Id. at pp. 98-99.

Beaulieu also stated that while in the BTU, police were called to escort him from the BTU to protective custody because he was upset about being denied access to the legal computer in order to meet a court-imposed deadline in a criminal matter.  See O'Neill Aff., Ex. 1 (Beaulieu Decl.), ¶ 44.  While he missed the court deadline, he was given an extension by the court.  Id.

In sum, Beaulieu is not asserting that he did not receive any access to a legal computer; only that he did not receive as much as he would have liked.  See O'Berg Aff., Ex. 5 (Beaulieu Dep.) at p. 76-79, 97-99.

Beaulieu argued that procedural due process was not afforded to him prior to defendants' refusal to give him access to a legal computer.  See Pls.' DHS Opp. at p. 60.  The DHS Defendants asserted no process was due, as they can restrict a patient's activities without process, so long the condition does not amount to a punishment.  See DHS Mem. at p. 53.

The Due Process Clause of the 14th Amendment provides that, "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  "A due process claim is cognizable only if there is a recognized liberty or property interest at stake." Ragan v. Lynch, 113 F.3d 875, 876 (8th Cir. 1997) (citation omitted); see also Krentz v. Robertson, 228 F.3d 897, 901 (8th Cir. 2000) ("Initially, a plaintiff must demonstrate that the state deprived him of some

'life, liberty, or property' interest."). "We need reach the question of what process is due only if the inmates establish a constitutionally protected liberty interest." <u>Wilkinson v. Austin</u>, 545 U.S. 209, 221 (2005); <u>see also Williams v. Norris</u>, 277 Fed. Appx. 647, 648-49 (8th Cir. 2008) ("Once a deprivation of a protected interest is established, "the next question is what process is due.") (citing <u>Wilkinson</u>, 545 U.S. at 224).

Beaulieu has not identified any property or liberty interest implicated by defendants' refusal to give him access to a legal computer, leaving this Court to guess as to what interest is at issue. In the Amended Complaint, it was alleged that Beaulieu was denied a certain level of access to facility, including access to legal computers, when he was placed in the BTU. <u>See</u> Amended Complaint, ¶ 34. Further, the Amended Complaint alleged he was entitled to procedural due process before being denied access to legal computers "afforded to other civilly committed detainees, because he has a <u>state-created liberty interest</u> in a certain level of access to facilities. <u>Id.</u> (emphasis added). Plaintiffs have not identified in their Amended Complaint or responsive brief, the contours, much less the source of this alleged state-interest. <u>See</u> Pls. Opp. DHS at p. 60. Regardless, even if plaintiffs had identified a state statute or rule that "guaranteed" him a certain level of computer usage for legal purposes, "there is no federal constitutional liberty interest in having state officers follow state law or prison officials follow prison regulations." <u>Phillips v. Norris</u>, 320 F.3d 844, 847 (8th Cir. 2003) (citing <u>Kennedy v. Blankenship</u>, 100 F.3d 640, 643 (8th Cir. 1996)).

For all of these reasons, The DHS Defendants are entitled to summary judgment on Beaulieu's claim that he was denied access to a legal computer, and the claim should be dismissed with prejudice.

## V..    CONCLUSION

Plaintiffs have raised numerous issues regarding the conditions of their residency and incidents and events that have occurred during the residency at the Annex, BTU and Complex 1.   Accepting plaintiffs' version of the facts regarding these conditions, events and incidents, and the policies and procedures that govern the handling these matters, this Court finds that the conduct alleged does not rise to level of a constitutional violation against any of the defendants.   On this basis, the Court recommends granting summary judgment be granted to both the DHS Defendants and DOC Defendants on all claims in their entirety, and that all claims be dismissed with prejudice.

This Court expresses its appreciation to court-appointed counsel for their vigorous, thorough representation of plaintiffs in this case.

## RECOMMENDATION

For the reasons set forth above and based on all the files, records, and proceedings herein, IT IS RECOMMENDED that:

1.     Defendants Joan Fabian and Terry Carlson's Motion for Summary Judgment [Docket No. 174] be **GRANTED**.

2.     Defendants Cal R. Ludeman, Jack Erskine, Dean Mooney, Paula Johnson, Denise Considine, Eric Hattenberger, Dennis Benson, Greg Carlson, Brian Ninneman, and Ann Linkert's Motion for Summary Judgment [Docket No. 179] be **GRANTED**.

Dated:        February 15, 2011

_s/ Janie S. Mayeron_
JANIE S. MAYERON
United States Magistrate Judge

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **March 2, 2011**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this Rules shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.